**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IRMA G. LEIBAS, FRANK DONIS,** | ) | |
| **BARBARA TAGUE, LUCY DiGIOIA,** | ) | |
| **and TAMIKA BARKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 7592** |
| | ) | |
| **THOMAS J. DART, Sheriff of Cook** | ) | **Judge Rebecca R. Pallmeyer** |
| **County (Official Capacity), COUNTY OF** | ) | |
| **COOK, a unit of local as indemnitor, and** | ) | |
| **REBECCA REIERSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Irma Leibas, Frank Donis, Lucy DiGioia, Barbara Tague, and Tamika Barker worked as Correctional Officers (COs) or Deputy Sheriffs (DSs) for the Cook County Sheriff's Office (CCSO). In the fall of 2018, Defendants—Thomas J. Dart, the Sheriff; Rebecca Reierson, an HR director; and Cook County—decided to enforce a policy that required all COs and DSs to rotate through each type of assignment for their respective positions. Until that time, Defendants had permitted Plaintiffs, who have various physical limitations, to remain in particular assignments that they were capable of performing. Plaintiffs contend that Defendants' enforcement of the 2018 policy violates their rights under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (ADA), in that it denied Plaintiffs work that they were capable of performing with reasonable accommodations. Defendants argue that there is no reasonable accommodation that would permit Plaintiffs to perform all the essential functions of their jobs, because the ability to rotate through assignments as needed is a basic requirement of the CO and DS positions. For the reasons discussed here, Defendants' Motion for Summary Judgment [94] is granted except as to the ADA discrimination and failure to accommodate claims of Plaintiff Leibas.

## BACKGROUND

### I.     Cook County Sheriff's Office

The Cook County Sheriff's Office (CCSO) is the principal law enforcement agency for Cook County, Illinois.  (Defs.' Local Rule 56.1 Statement of Material Facts (hereinafter "DSOF") [96] ¶ 9.)[1]  Defendant Thomas J. Dart, the elected Sheriff of Cook County, Illinois, is the official head of the CCSO.  (*Id.* ¶ 7.)  Defendant Rebecca Reierson is the Director of Employee Services for the CCSO's Department of Human Resources.  (*Id.* ¶ 8.)  Three divisions of the CCSO employ sworn law enforcement staff: (1) the Cook County Department of Corrections (CCDOC), which operates a large pretrial detention facility; (2) the Court Services Department, which provides security for court facilities and carries out service of summonses, warrants, orders of protection, eviction orders, and child-support orders; and (3) the Cook County Sheriff's Police Department, which provides police services in the unincorporated areas of Cook County.  (*Id.* ¶ 9.)

The two CCSO jobs at the center of this case, Correctional Officer (CO) and Deputy Sheriff (DS), are both deputized, sworn peace officer positions subject to the requirements of the Illinois Law Enforcement Training and Standards Board.[2]  (*Id.* ¶¶ 10, 11.)  COs primarily work in the CCDOC detention facility, where their central responsibility is ensuring the safety and security of

---

[1]     Local Rule 56.1 requires the party opposing a motion for summary judgment to respond to the movant's statement of facts with a response to each paragraph; "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact."  LR 56.1(b)(2), (e)(3).  In many instances here, Plaintiffs purport to disagree with one of Defendants' statements of fact, but instead of doing so in adherence to the rule (or in addition to doing so), they add extraneous commentary pushing their theory of the case.  Such commentary is improper.  *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 app. 1 (N.D. Ill. 2005) ("[Facts] should be deemed admitted due to Plaintiffs' . . . assertion of purely argumentative denials and extraneous information and argument.").  Plaintiffs are deemed to have admitted any facts that they did not specifically contest.  LR 56.1(e)(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.").

[2]     The parties have not clearly explained the significance of these labels, but it is clear by implication that such jobs demand a higher rate of pay than many administrative jobs in the CCSO.

staff, inmates, and visitors. (*Id.* ¶¶ 12, 23.) To become a CO, an individual undergoes a 16-week training program that combines physical fitness training with classroom instruction, defensive tactics training, and scenario-based exercises. (*Id.* ¶ 11.) DSs work in the CCSO's Court Service Department, where their central responsibility is maintaining security and order in the CCSO's courthouses. (*Id.* ¶¶ 14, 29.) To become a DS, an individual must first serve as a CO and then, after transfer, undergo several additional weeks of instruction, which includes further physical fitness training and scenario-based exercises. (*Id.* ¶ 11.)

For both the CO and DS positions, each employee's work locations, shifts, and days off are determined through a bidding system. (*Id.* ¶¶ 12, 14.) COs and DSs do not bid for specific assignments, however.[3] (*Id.* ¶¶ 12, 14.) Examples of CO assignments include "tier officer" (supervising a living unit), "movement officer" (transporting detainees), "med pass officer" (escorting nurses who dispense medication), "recreation officer" (supervising detainees engaged in recreation), and "sanitation officer" (supervising detainees responsible for sanitation). (Burke 30(b)(6) Dep., Ex. 1 to DSOF [96-1] at 21:18–22:7, 24:10–25:13.) Examples of DS assignments include providing courtroom security, working in the detainee lockup area, conducting security screening at building entrances, and providing roving security throughout a building. (DSOF ¶ 14.) Assignments typically last about 90 days at a time, but they are subject to change based on the CCSO's operational needs. (*Id.* ¶¶ 12, 14.)

## II. Essential Functions Checklists

For both the CO and DS positions, the CCSO maintains "essential functions" checklists, identifying the essential functions and responsibilities of a CO or DS. (*Id.* ¶¶ 25, 30.)

The CO checklist was created in 2015 and revised most recently in July 2017. (*Id.* ¶ 25.) The essential functions of a CO include working closely with and monitoring detainees; defusing disruptive behavior verbally and, if needed, physically; searching detainees and their living

---

[3] The parties do not explain the process by which COs and DSs are placed in assignments, though Plaintiff Donis testified that the matter is "up to [the] supervisor."

quarters; transporting detainees; processing new admissions; writing narrative reports and filling out logbooks; and participating in training required by the CCSO. (*Id.*; Job Description – Essential Job Functions (Correctional Officer), Ex. 4 to Burke Decl., Ex. 2 to DSOF (hereinafter "CO Essential Functions Checklist") [96-2] at Plaintiff 217.) The amount of time that a CO spends performing any one of these functions varies based on the CO's current assignment and the operational needs at the time. (DSOF ¶ 27.) Because a CO must be able to rotate through all possible assignments as needed, Defendants maintain, each CO must be able to perform all essential functions with or without a reasonable accommodation. (*Id.*)

Although Plaintiffs suggest broadly that that the CO checklist does not consist of the "true essential functions" for the position (Plaintiffs' Local Rule 56.1 Statement of Facts Responses (hereinafter "PSOFR") [109] ¶ 25), they do not create a genuine dispute of fact about any specific items on the CO list. Instead, Plaintiffs assert that before September 2018 (when, as explained below, the CCSO began enforcing the rotation requirement), some COs were allowed to work permanently in modified-duty assignments in which they did not perform all essential functions and were not required to rotate assignments as needed.[4] (*Id.*) Relatedly, Plaintiffs insist that certain COs, such as those in the records department or the video monitoring room, have administrative, sedentary functions that do not require any contact with detainees. (*Id.* (citing Barker Dep., Ex. 7 to DSOF (hereinafter "Barker Dep.") [96-7] at 139:5–140:15).) But they provide no evidence that, since 2018, such COs are not subject to assignment rotation or otherwise do not have to perform specific essential functions contained in the checklist.

The DS checklist was created in January 2018. (DSOF ¶ 30.) The essential functions for this position include maintaining security and order in courthouses; effectively communicating and engaging with detainees, staff, and the public; using physical force if necessary to maintain safety

---

[4] Defendants have admitted that "[p]rior to September 2018, some COs with permanent restrictions were allowed to work in modified or light-duty assignments on a non-temporary basis." (*See* Burke Decl., Ex. 2 to DSOF [96-2] ¶ 10.)

and security; supervising detainees; operating entry screening equipment; responding quickly to emergency situations, which includes bending, crouching, kneeling, running, lifting, and twisting; wearing a duty belt and carrying a firearm; and writing narratives and entering data into computer systems. (*Id.*; Job Description – Essential Job Functions (Deputy Sheriff), Ex. C to Bellettiere Decl., Ex. 3 to DSOF (hereinafter "DS Essential Functions Checklist") [96-3].) According to Defendants, the amount of time that a DS spends performing a particular function may vary based on the DS's current assignment and the CCSO's operational needs at the time. (DSOF ¶ 31.) Although a DS does not use a firearm when working in a courtroom, they must carry a firearm, at a minimum, when they are assigned to operate the courthouse security-screening equipment or assigned to work at the courthouse front door. (PSOFR ¶ 29.) Because a DS must be able to rotate through assignments as needed, Defendants maintain, each DS must be able to perform all essential functions with or without a reasonable accommodation. (DSOF ¶ 30.)

Again, Plaintiffs purport to dispute the accuracy of the checklist. (PSOFR ¶ 30.) Plaintiff Tague, they say, "can relieve other deputies in courtrooms without issue even if she cannot carry a duty weapon." (*Id.*) And Plaintiff DiGioia, they say, can "relieve other deputies and work any courtroom or front door assignment" despite her restrictions. (*Id.*) Once again, however, these assertions do not create genuine disputes of fact about the essential functions of a DS—a position that is not limited to "courtroom" or "front door" assignments.

### III. Work Restrictions

A CO or DS who suffers an injury on duty ("IOD") may go on IOD leave. (DSOF ¶ 15.) While on IOD leave, an employee works toward maximum medical improvement ("MMI"). (*Id.*) When feasible, the CCSO will allow an employee who is working toward MMI to continue employment in a light or modified-duty assignment. (*Id.*) If the employee still has work restrictions after achieving MMI, the CCSO will engage with them in an interactive process to determine (1) whether the employee is unable to perform any essential job functions or their job, and (2) whether any reasonable accommodation exists to allow them to perform those functions. (*Id.*)

A CO or DS who suffers from an illness or injury that is *not* related to work may be eligible for a transitional work assignment ("TWA").  (*Id*. ¶ 16.)  To be eligible for a TWA, the employee's medical records must show that their work restrictions are not expected to persist for more than six months.  (*Id.* ¶ 17.)  The procedure for transitional assignments is governed in part by COs' and DSs' collective-bargaining agreements.  (*Id.* ¶¶ 16–17; *see also id.* ¶ 6.)  At the end of a transitional work assignment, an employee is required either to return to full duty or, if they are unable to return to full duty, to utilize available leave options or resign.  (*Id.* ¶ 17.)  Neither a CO nor a DS may participate in a TWA for more than six months in a rolling 24-month period.  (*Id.*)

The CCSO also maintains an accommodation policy for COs and DSs who have permanent medical restrictions.  (*Id.* ¶ 18; *see also* Article AA: Accommodation Procedure, Ex. 85 to Reierson Dep., Ex. 4 to DSOF (hereinafter "CCSO Accommodation Procedure") [96-4].)  Under this policy, COs and DSs must be able to perform all the essential functions of their positions with or without an accommodation.  (*Id.*)  According to Defendants, although the IOD and TWA policies on temporary restrictions permit light-duty assignments, the permanent accommodation policy does not allow COs or DSs to maintain light-duty assignment indefinitely.  (DSOF ¶ 19.)  Plaintiffs disagree for reasons already discussed, as they contend that the CCSO earlier did in fact provide permanent "modified-duty" assignments for "many" COs and DSs (with the implication that the CCSO still could and should provide such assignments).  (PSOFR ¶ 19.)  Defendants' position is supported by the text of the policy itself, which provides that "[i]f the employee cannot perform the Essential Functions of his or her current position, [CCSO] will identify vacancies of other positions/classifications."  (CCSO Accommodation Procedure at 4.)  The policy, which is dated January 1, 2015, does not mention permanent modified-duty assignments.  (*Id.*)  As noted above, however, Defendants have admitted that "[p]rior to September 2018, some COs with permanent restrictions were allowed to work in modified or light-duty assignments on a non-temporary basis."  (Burke Decl., Ex. 2 to DSOF (hereinafter "Burke

Decl.") [96-2] ¶ 10.)  The court therefore turns to evidence about the CCSO's decision to begin vigorous enforcement of its written policy at that time.

**IV.     September 2018 Memorandum**

Beginning in 2017, the CCSO faced substantial budget reductions, which led it to modify certain personnel policies and practices.  (DSOF ¶¶ 36–38.)  After hiring an average of 250 COs per year between 2014 and 2017, the CCSO hired no new recruits between August 2017 and October 2018.  (*Id.* ¶ 38.)  And although the Court Services Department historically staffed its courthouses with some 1,000 DSs, that number was reduced to 781 by November 2017.  (*Id.* ¶ 41.)  The CCSO also ceased its practice of annually transferring COs to DS positions because continuing those transfers would have left too few COs to staff the CCDOC detention facility effectively.  (*Id.* ¶¶ 39, 42.)  These reductions and freezes, coupled with the CCSO's regular rate of attrition from retirements, resignations, leaves of absence, and terminations, led to severe staffing shortages.  (*Id.* ¶¶ 38, 42.)

On September 4, 2018, the CCSO's chief operating officer, Bradley Curry, sent the HR department a memorandum requesting that it "implement a plan for maximizing [its] sworn workforce."  (Curry Mem., Ex. 5 to Burke Decl. (hereinafter "Curry Mem.") [96-2] at 1; *see also* DSOF ¶ 44.)  Specifically, the memorandum asked HR to "examine the assignments that sworn officers are currently serving in that do not require the performance of a sworn officer."  (Curry Mem. at 1; *see also* DSOF ¶ 44.)  The memorandum briefly discussed the recent budget cuts and staffing shortages that the CCSO had faced.  (Curry Mem. at 1.)  And it noted that many officers maintained their sworn positions while being allowed to work indefinitely in assignments that did not require them to perform the essential functions of those positions.  (Curry Mem. at 1; *see also* DSOF ¶ 44; Burke Decl. ¶ 10.)  These indefinite modified assignments were, the memorandum asserted, incompatible with the officers' collective-bargaining agreements, which provided that modified work assignments are limited to six-month periods.  (Curry Mem. at 1; *see also* DSOF ¶ 44.)  Moreover, the memorandum noted, a sworn officer's "inability to work on tiers or respond

7

to emergency incidents puts an undue burden on their fellow officers, as the assignments of correctional officer[s] require[] them to be able to respond to emergencies and be capable of physically protecting the safety and security of the staff, inmates, and facility." (Curry Mem. at 1.) If some officers could not perform these functions (especially responding to emergencies), the memorandum said, then the overall work pool would be strained further. (Curry Mem. at 1; *see also* DSOF ¶ 44.)

The CCSO's HR department responded to Curry's directive by reviewing the number of COs and DSs working in light- or modified-duty assignments; ensuring that the HR department had accurate information about each employee's medical restrictions; determining whether those restrictions were permanent or temporary; and determining whether the employees could be returned to work in full-duty assignments. (DSOF ¶ 45.)

**V.     September 2018 "Options" Letter**

On September 14, 2018, Defendant Reierson (the Director of Employee Services for the CCSO's HR Department) sent a letter to approximately 70 or 80 COs and DSs who, according to the HR department's existing records, had permanent medical restrictions that prevented them from performing one or more essential functions of their positions. (DSOF ¶¶ 48, 50.) Some of these individuals were then working in light- or modified-duty assignments, while others were on IOD leave. (Reierson Decl., Ex. 6 to DSOF (hereinafter "Reierson Decl.") [96-6] ¶ 8.) The letter asked each employee to confirm their existing medical restrictions and to provide updated medical paperwork. (DSOF ¶ 49.) The letter gave the recipients three options, with a 14-day timeline. (*Id.*) First, a recipient could present updated medical documents showing that they no longer had restrictions that prevented them from performing the essential functions of his position with or without an accommodation. Second, a recipient could request a reasonable accommodation under the ADA. Here, the letter stated that "an alternative assignment (i.e. desk duty) that does not encompass the essential functions of your job title is not considered a reasonable accommodation." Third, if a recipient was not able to perform the essential functions of their

8

position under the first or second options, they could take an online skills assessment (called an "eSkills assessment") to determine if they qualified for an alternative vacant position at the CCSO. (*Id.* ¶ 49.)

Between September 2018 and the filing of Defendants' summary judgment motion, the CCSO's HR department engaged with approximately 108 COs and DSs regarding permanent medical restrictions that affected their ability to perform the essential functions of their jobs. (DSOF ¶ 52.) Of this set, 46 individuals returned to full-duty assignments after submitting paperwork showing that they no longer had work restrictions and could fully perform the essential functions of their job without an accommodation. (*Id.* ¶ 53.) Approximately 16 individuals retired from their employment with the CCSO, and 5 took disability leave. (*Id.* ¶ 55.) Others, including Plaintiffs, notified the HR department that they still had medical restrictions and, at least initially, engaged with HR to determine (1) whether their restrictions could be reasonably accommodated in their current position, and, if not, (2) whether they qualified for an alternative vacant position at the CCSO. (*Id.* ¶ 54.)

## VI. Plaintiffs

The parties provide the following limited set of facts about each of the Plaintiffs.

### A. Tamika Barker

Tamika Barker began working as a CO at the CCSO on November 9, 2009. (Barker Dep. at 32:9–11.) Since she began, Barker has worked in many different assignments, including monitoring inmates in their living units. (DSOF ¶ 58.) Barker suffers from chronic hemiplegic migraines that began in 1999.[5] (*Id.*) Barker testified that when she has a migraine episode, she feels that she is "in slow motion, just dragging," and that she "do[esn't] have the energy or the motivation to move quickly." (Barker Dep. at 172:21–173:24.)

---

[5]     A hemiplegic migraine is a rare form of migraine headache that can cause throbbing pain, nausea, and numbness or weakness. *See* https://medlineplus.gov/genetics/condition/sporadic-hemiplegic-migraine (last visited Mar. 30, 2022).

In 2013 or 2014, Barker sought a light-duty assignment based on her physician's advice that she should work in a less stressful position. (DSOF ¶ 59.) In January 2015, Barker's physician completed an essential functions checklist and stated that Barker could not defuse disruptive behavior and should not have contact with inmates. (*Id.*) The parties do not specify whether Barker was granted a light-duty assignment in response to the physician's checklist, though Barker testified that, around this time, she had assignments including the Administrative Relief Team, which was a floating position to fill shortages (the parties do not specify which positions with shortages the team would fill), and Visitation, which involved making phone calls and processing visitors' applications to enter the jail. (Barker Dep. at 50:1–51:11, 56:9–57:17.)

On September 14, 2018, Reierson sent a letter to Barker, asking her to submit medical documentation to the HR Department, in order to help determine whether she could perform the essential functions of the CO position. (DSOF ¶ 60.) In October 2018, Barker's physician, Dr. Evelyn Bell, submitted documentation in which Dr. Bell stated that Barker is not able to work closely with detainees, defuse disruptive behavior, search inmates to detect and confiscate contraband, prepare inmates for transportation, or transport inmates outside of the facility. (Ex. 29 to Barker Dep. [109-7] at Defendants 4784.) Dr. Bell also recommended that Barker perform sedentary work. (*Id.* at Defendants 4783; PSOFR ¶ 123.)

As a result of the work limitations noted by Dr. Bell, Reierson determined that Barker could not meet the essential functions of the CO position without an accommodation. (Reierson Decl. ¶ 17.) On or around October 16, 2018, Reierson called Barker to discuss options. (DSOF ¶ 64.) Reierson asked Barker to complete the eSkills assessment to determine whether there was a civilian role that met her restrictions. (*Id.* ¶ 66.) Barker completed the assessment in February 2019 and passed the test for the Administrative Assistant II position. (*Id.*) On March 4, 2019, Reierson emailed Barker and told her that due to her medical restrictions, she could not continue to work as a CO, but offered her a position as an Administrative Assistant II. (Ex. 35 to Barker Dep. [109-7] at CCSO 6527.) Reierson also informed Barker that her "temporary modified duty

assignment will end on March 16, 2019." (*Id.*) Barker accepted the job offer—while noting that she was "not giving up any rights to pursue legal remedies"—and began work in the Administrative Assistant II position on March 17, 2019. (*Id.* at Defendants 6526; DSOF ¶ 66.)

### B. Lucy DiGioia

Lucy DiGioia began working as a DS in 1998. (PSOFR ¶ 118.) DiGioia has had issues with her back and neck since an injury at work in 2003. (DiGioia Dep., Ex. 8 to DSOF (hereinafter "DiGioia Dep.") [96-8] at 14:2–12.) At some point not specified by the parties, DiGioia was diagnosed with fibromyalgia and herniated disks. (DSOF ¶ 69.) DiGioia testified that after she returned to work following a car accident in 2017, she submitted ADA paperwork. (DiGioia Dep. at 112:8–24, 172:2–8.) The parties do not say whether DiGioia was given ADA accommodations at this time. DiGioia states that she next submitted an updated doctor's note in September 2018; whether this was in response to a letter from Reierson is not clear from the record. (*Id.* at 132:4–133:1.)

On August 30, 2019, DiGioia requested FMLA leave to care for her son. (PSOFR ¶ 116.) That same day, in a response on the same email chain in which DiGioia sought FMLA leave, Wylola Shinnawi of the CCSO's HR department asked DiGioia to submit updated ADA reasonable accommodation paperwork based on her current medical restrictions. (*Id.*; DSOF ¶ 71.) Since DiGioia's restrictions had nothing to do with her FMLA request, the "sudden requirement" to "complete new ADA paperwork in conjunction with [her] FMLA request for [her] son" put DiGioia "in fear of losing [her] job through the ADA process." (DiGioia Decl., Ex. 18 to PSOFR [109-18] ¶¶ 8–9.) DiGioia was granted FMLA leave in 2019, and—though the parties do not specify the reason—again in 2020. (DSOF ¶ 70.)

On September 7, 2019, DiGioia's physician, Dr. Gene Neri, submitted the updated reasonable accommodation paperwork to the CCSO's HR Department, in response to Shinnawi's request. (*Id.* ¶ 72.) Dr. Neri stated that due to DiGioia's limitations, she could not have a "physical encounter" with detainees, she could not wear a full duty belt or bulletproof vest, she needed to

11

take breaks, and she could not perform security functions that involve bending, crouching, kneeling, running, lifting, or twisting. (*Id.*; Ex. 64 to DiGioia Dep. [109-8] at Defendants 14–15.) After Reierson reviewed DiGioia's accommodation paperwork, Reierson decided that DiGioia could not meet the essential functions of the DS position. (DSOF ¶ 73.) On October 7, 2019, DiGioia was transferred to a clerical assignment due to a disciplinary matter unrelated to this lawsuit and unexplained by the parties. (*Id.* ¶ 75.) DiGioia testified that she transferred to clerical work because she was "de-deputized"—possibly as a result of the discipline, but that is unclear— and that she could not carry a firearm or dress in her uniform. (DiGioia Dep. at 95:10–96:5.) DiGioia retained her same title and pay. (*Id.* at 94:13–95:2.)

A year after DiGioia was transferred to a clerical assignment, on October 5, 2020, Reierson emailed DiGioia asking if she was "able to proceed with the interactive process based on [DiGioia's] previous paperwork and [their] prior discussions," or whether DiGioia would be "submitting a new reasonable accommodation request." (Ex. B to Reierson Decl. [96-6] at Defendants 6922.) On October 6, DiGioia responded that she had "been doing [her] job with no problems." (*Id.* at Defendants 6919.) DiGioia did not otherwise respond to Reierson; the remainder of her email consisted of complaints about a perceived hostile work environment, and DiGioia's request to be re-deputized. (*Id.* at Defendants 6919–21.) On October 8, DiGioia emailed Reierson again to ask about her deputy credentials. (*Id.* at Defendants 6917–19.) Later that day, Reierson responded by email, explaining that she "ha[s] no involvement with credentials" and thus could not help DiGioia with that matter. (*Id.* at Defendants 6916.) Reierson reiterated that the intent of her email was to ask DiGioia whether the medical limitations assessed by Dr. Neri in 2019 remained accurate or whether DiGioia needed to submit an updated reasonable accommodation packet. (*Id.* at Defendants 6916–17.) For DiGioia's convenience, Reierson "attached another blank packet to be completed if the one previously submitted no longer accurately reflects [DiGioia's] limitations." (*Id.* at Defendants 6917.) Reierson claims that DiGioia

did not respond further.  (Reierson Decl. ¶ 27.)  DiGioia testified that she never saw the October 8 response from Reierson.  (DiGioia Dep. at 131:13–17.)

On May 5, 2021, DiGioia submitted a new medical note to HR which stated that she no longer has any work restrictions.  (DSOF ¶ 78.)  DiGioia remains in her position as a DS and has not suffered a change in pay or benefits.  (*Id.* ¶ 77.)

### C.    Frank Donis

Frank Donis began working as a CO in 2006, and has since then worked in several different assignments, including monitoring inmates.  (*Id.* ¶ 80; Donis Dep., Ex. 9 to DSOF (hereinafter "Donis Dep.") [96-9] at 57:2–16.)  Donis testified that "it's up to your supervisors where they assign you, so every day they give you an assignment and you go to that assignment." (Donis Dep. at 84:2–5.)  In 2016, Donis tore his right meniscus while on duty; Donis also has a non-duty injury to his left knee.  (DSOF ¶ 80.)  Donis received the "options" letter from Reierson on September 14, 2018.  (*Id.* ¶ 82.)  On November 5, 2018, Donis's physician assistant, Megha Patel, completed an ADA Accommodation Form.  (*Id.* ¶ 83.)  Patel stated that Donis has arthritis and cannot stand for long periods of time, cannot lift over 10 pounds, cannot climb stairs or ladders, and cannot squat or walk quickly.  (*Id.*)  She also stated that Donis needs to use a cane and a knee brace, and that he cannot have direct contact with inmates.  (*Id.*)  Patel also determined that Donis could not work all shifts or locations, and that he could not be available to work consecutive shifts in response to operational needs.  (*Id.* ¶ 84.)

A question on the reasonable accommodation form that Donis signed asks, "How is your limitation(s) interfering with your ability to perform the essential functions of your job?"  (Ex. 55 to Donis Dep. [96-9] at Plaintiff 1045.)  Donis responded that he lacked "the ability to restrain violent detainees and escort[ ] multiple detainees within the jail compound" and that he could not "work[ ] in a hostile work environment, surrounded by detainees that have issues following the sheriff[']s rules and policies," which Donis described as "a daily issue in the jail compound."  (*Id.*)  Donis stated that he sought an accommodation of "light duty" work.  (*Id.*)  Reierson asked Donis to

complete an eSkills assessment test to determine if there was a civilian role that met his restrictions. (DSOF ¶ 87.) Donis took the assessment in April 2019. (*Id.*) Donis emailed Reierson and requested an "[a]dministrative assignment[ ]" where he would "not be[ ] exposed to the work assignments at the JAIL." (Ex. D to Reierson Decl. [96-6] at Defendants 4681; DSOF ¶ 87.) Reierson responded that a particular assignment is not a reasonable accommodation, and she asked Donis to take the eSkills Assessment again. (DSOF ¶ 87.) Donis did not respond. (*Id.*)

Donis testified that he could perform all the essential functions of the CO position with the accommodation of being permitted to use his cane and knee brace. (Donis Dep. at 186:11– 191:1.) But this testimony contradicts the medical evidence Donis submitted to Reierson in 2018, which Reierson relied upon in determining that there was no reasonable accommodation that would enable Donis to perform the work of a CO. In addition, Defendants assert that a cane is considered contraband under CCSO General Order 9.7.1. (*See* DSOF ¶ 88; Reierson Decl. ¶ 31.) Plaintiffs do not specifically contest that assertion, beyond noting that Donis has used a cane as a CO in the past. (*See* PSOFR ¶ 88.) Donis remains in his position as a CO and is currently in a temporary modified duty assignment that meets his restrictions. (DSOF ¶ 89.)

### D. Irma Leibas

Irma Leibas began working as a CO in 2010. (Leibas Dep., Ex. 10 to DSOF (hereinafter "Leibas Dep.") [96-10] at 19:17–20.) Leibas is diagnosed with Raynaud's Syndrome, scleroderma, lupus, and irritable bowel syndrome. (DSOF ¶ 91.) Because of her conditions, she has issues with her blood circulation when she is under stress; when she experiences a flare-up, she has extreme fatigue and needs to limit her movement. (*Id.*) Between 2015 and 2018, the CCSO accommodated Leibas's medical restrictions by allowing her to have limited contact with detainees and avoid working in medical dispensaries or outdoors when the temperature is below 70 degrees or over 85 degrees. (*Id.* ¶ 92.)

Leibas received a letter from Reierson on September 14, 2018, regarding her work restrictions. (*Id.* ¶ 94.) Leibas testified that she was out on disability leave at the time. (*See* Leibas Dep. at 27:12–19.) On September 28, 2018, Leibas's physician, Dr. Monica Aloman, responded in a letter explaining that Leibas was seen at her clinic for her chronic conditions, but that Aloman could not determine Leibas's work restrictions because Leibas was "currently not in the work place [sic] due to being on disability." (Ex. 78 to Leibas Dep. [96-10] at Plaintiff 760.) In February 2019, Leibas returned to work for about one month before taking disability leave again. (DSOF ¶ 95.)

On May 6, 2019, Leibas emailed Reierson to inquire about vacant positions at the CCSO. (*Id.* ¶ 97.) On May 29, Leibas submitted reasonable-accommodations paperwork filled out by Dr. Aloman. (*Id.* ¶ 98.) In that submission, Dr. Aloman stated that Leibas could perform all essential CO job functions with accommodations. (Ex. 82 to Leibas Dep. [96-10] at Defendants 4420.) Dr. Aloman listed the following accommodations: wear gloves at all times, wear a battery-powered jacket during colder months, and be allowed to take more frequent breaks to rest and use the bathroom. (*Id.* at Defendants 4419.)

On August 16, 2019, Leibas emailed Reierson and her attorney, Cass Casper; Leibas asked Reierson to "please contact my attorney (Casper) if there is something you need to discuss." (Ex. 77 to Leibas Dep. [96-10] at Defendants 4444.) On August 21, Reierson responded directly to Leibas (without copying Casper) and explained that based on the paperwork Leibas had submitted, Reierson was "trying to engage [Leibas] in the reasonable accommodation process." (*Id.* at Defendants 4443.) Reierson asked Leibas to give her a call, and also told Leibas that if she was interested in participating in the accommodation process, she needed to take a skills assessment. (*Id.*) Leibas did not respond, and on September 10, 2019, Reierson sent another email (again, without copying Casper) in which she told Leibas that "[d]ue to [her] lack of response, it is apparent that [she is] not interested in participating in the interactive process regarding a reasonable ADA accommodation at the Sheriff's Office." (*Id.*) Leibas testified that

she felt the CCSO wanted her to "go through this circus all over again and [she] wasn't going to do it again." (Leibas Dep. at 136:23–137:23.)

On November 11, 2019, Reierson emailed Leibas to explain that there was no reasonable accommodation that would enable her to perform the essential functions of her current position, and that it was therefore important for the CCSO to determine if there was an alternative position for which Leibas was qualified. (Ex. 84 to Leibas Dep. [96-10] at Defendants 6888.) Leibas did not respond or take the eSkills Assessment as requested by Reierson. (DSOF ¶ 102.) Leibas has not returned to the workplace since March 2019, and she has not received a payroll check from the CCSO since that time. (*Id.* ¶¶ 96, 103.) Still, the parties note that Leibas "has not been terminated from employment at CCSO and remains in her CO title." (*Id.* ¶ 103.) It is unclear from the record whether, how, or when Leibas might return to work.

### E.     Barbara Tague

Barbara Tague worked at the Criminal Courts Building as a Deputy Sheriff beginning in about 1995. (PSOFR ¶ 119.) Tague testified that she has a disability related to arthritis in both shoulders, as well as stress and anxiety. (DSOF ¶ 105.) On March 27, 2019, at an annual in-service training, Tague was unable to lift her weapon due to her shoulder arthritis and torn rotator cuffs.[6] (*Id.* ¶ 106.) Tague then submitted reasonable accommodations paperwork to HR and emailed Reierson, requesting an assignment in which she would not be required to carry her weapon. (*Id.* ¶ 107.) Plaintiffs assert that most of the Deputy Sheriffs do not carry weapons while working assignments inside the Criminal Courts Building, but instead "bench" the weapons in lockers. (PSOFR ¶ 120.) Deputies are not permitted to carry weapons inside courtrooms because it presents a safety risk. (*Id.*)

---

[6]     Tague testified that, before 2019, she had successfully completed the CCSO's annual firearm training every year since 1994. (Tague Dep., Ex. 11 to DSOF [96-11] at 49:10–23.)

On April 2, 2019, Reierson called Tague to discuss her medical restrictions. (DSOF ¶ 108.) Reierson determined that Tague's inability to carry and use a firearm meant that she could not perform the essential functions of the DS position, and so Reierson sent Tague the link to the eSkills Assessment to see if there was an alternative position Tague could perform. (*Id.*) Tague completed the eSkills Assessment on April 12, 2019. (*Id.* ¶ 109.) Then, on April 19, Tague withdrew her application for an ADA reasonable accommodation because Tague's doctor believed that she could once again carry a firearm if she rested, took medication, and completed physical therapy. (*Id.* ¶ 110.) On a date and for a reason not specified by the parties, Tague went on disability leave and has not since returned to work, though she remains listed as an employee of the CCSO and retains her DS title. (*Id.* ¶ 111.)

## VII.    EEOC Charges

Tague, Leibas, Donis, and DiGioia filed EEOC charges between March 22, 2019, and October 4, 2019. (*Id.* ¶¶ 79, 90, 104, 112.) Those Plaintiffs each alleged disability discrimination and failure to accommodate. (*Id.*) Barker did not file an EEOC charge.

## <u>DISCUSSION</u>

The standards that govern a motion for summary judgment are familiar. The court should grant such a motion only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts should draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing

*Matsushita*, 475 U.S. at 587).  "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate."  *Boss*, 816 F.3d at 916.

## I.  Exhaustion of Administrative Remedies

Defendants raise two procedural arguments at the outset of their motion: first, they argue that Barker failed to exhaust her ADA claims, and second, they argue that Plaintiffs' mention of workplace harassment during certain depositions cannot form the basis for legal claims.  Both parties agree that Barker did not file a charge of discrimination or receive a right to sue letter.  (*See* Defs.' Mem. in Supp. of Mot. for Summ. J. (hereinafter "Defs.' Mem. in Supp.") [95] at 3; Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. (hereinafter "Pls.' Resp.") [110] at 5.)  A plaintiff is ordinarily barred from asserting ADA claims in a federal lawsuit that were not raised in an EEOC charge.  *See Freeman v. Travelers Cos., Inc.*, 63 F. Supp. 3d 867, 871 (N.D. Ill. 2014) ("The ADA adopts Title VII's procedures in requiring a plaintiff to file a timely charge with the EEOC and to receive, in return, a right-to-sue notice from the EEOC before filing suit against an employer." (citing 42 U.S.C. §§ 2000e–5, 12117(a))).

Plaintiffs argue that the "single-filing exception," or "piggybacking," allows them to assert Barker's ADA claims here.  (Pls.' Resp. at 4–7.)  In *Horton v. Jackson County Board of County Commissioners*, 343 F.3d 897 (7th Cir. 2003), the Seventh Circuit noted that "if the would-be intervenor's claim arises out of the same or similar discriminatory conduct, committed in the same period, as the claim in the suit in which he wants to intervene, his failure to file a timely charge will be disregarded."  *Horton*, 343 F.3d at 899.  The court also stated, however, that the doctrine is most clearly justified in the context of class actions, where "[r]equiring that every class member file a separate charge might drown agency and employer alike," and that in the context of "a two-complainant case . . . the rationale of the doctrine is attenuated to the point of nonexistence."  *Id.* at 900.  Here, Barker's claim arises out of the same alleged unlawful conduct as the other four Plaintiffs: the letter from Reierson in the fall of 2018, in which Defendants requested Plaintiffs confirm their medical restrictions and provide updated paperwork.  In any event, in this case, as

the court is granting Defendants' motion for summary judgment on all of Barker's claims on the merits, Defendants are not prejudiced by the court's consideration of Barker's claims despite her failure to exhaust administrative remedies.

Defendants also argue that various complaints about harassment and a hostile work environment made by plaintiffs DiGioia, Donis, and Leibas during their depositions cannot now form the basis of legal claims not previously asserted in an EEOC charge. (*See* Defs.' Mem. in Supp. at 4.) But, as Plaintiffs note, they have never tried to press those claims and are not doing so on summary judgment. (Pls.' Resp. at 7.) Defendants' argument is moot.

## II. ADA Discrimination and Failure to Accommodate

To prevail on a disparate-treatment claim, a plaintiff must prove that (1) they were disabled, (2) they were qualified to perform the essential functions of their job with or without a reasonable accommodation, and (3) their disability was a "but for" cause of an adverse employment action. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). To prevail on a failure-to-accommodate claim, a plaintiff must prove that (1) they were a qualified individual with a disability, (2) their employer was aware of their disability, and (3) the employer failed to reasonably accommodate the disability. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). Thus, for both types of claims, a plaintiff must establish that they are a "qualified individual" under the ADA. If a plaintiff cannot do so, both claims fail.

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(3). Reasonable accommodations are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable [a qualified] individual with a disability . . . to perform the essential functions of that position." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (alteration in original) (quoting 29 C.F.R. § 1630.2(*o*)(1)(ii)). Whether a function is essential is a

question of fact, not law. *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016). A court "consider[s] the employer's judgment, including written job descriptions, as evidence." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (citing 42 U.S.C. § 12111(8)). Generally, a court will not "second-guess" an employer's judgment, *DePaoli v. Abbott Lab'ys*, 140 F.3d 668, 674 (7th Cir. 1998), but "this deference is not unqualified." *Tonyan,* 966 F.3d at 687–88. The court also looks to "the reality on the ground," including "the consequences of not requiring the employee to perform the function, the amount of time an employee actually spends performing the function, and the experience of those who previously or currently hold the position." *Id.* at 688 (citing *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 197–98 (7th Cir. 2011)).

As mentioned above, the CCSO's essential-functions checklist for a CO includes working closely with and monitoring detainees; defusing disruptive behavior verbally and, if needed, physically; searching detainees and their living quarters; transporting detainees; processing new admissions; writing narrative reports and filling out logbooks; and participating in training required by the CCSO. (CO Essential Functions Checklist.) The CCSO's essential-functions checklist for a DS includes maintaining security and order in courthouses; effectively communicating and engaging with detainees, staff, and the public; using physical force if necessary to maintain safety and security; supervising detainees; operating entry screening equipment; responding quickly to emergency situations, which includes bending, crouching, kneeling, running, lifting, and twisting; wearing a duty belt and carrying a firearm; and writing narratives and entering data into computer systems. (DS Essential Functions Checklist.)

The parties agree that the amount of time a CO or DS spends performing any one of these functions will typically vary based on the individual's current assignment. (DSOF ¶¶ 26, 31.) Different assignments naturally carry with them different sets of responsibilities. Given these distinctions between different CO and DS assignments, Plaintiffs contend that the CCSO should be able to provide reasonable accommodations for Plaintiffs by allowing them to work permanently in assignments that require them to perform only those essential functions that they

20

can perform with or without an accommodation.  After all, Plaintiffs say, the CCSO seemed to provide exactly this form of accommodation to many of them in the past, so it should continue to do so moving forward.  For several reasons, the court cannot accept this theory.[7]

Where a job involves several essential functions, it is generally not reasonable to require the employer to accommodate a disabled employee by carving out those functions that the employee is unable to perform.  *See Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, and 22nd Jud. Cirs.*, 601 F.3d 674, 680 (7th Cir. 2010) ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee."); *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) (holding that the ADA does not require an employee to create "a different job, comprising a subset of the [existing job's] tasks, rather than [provide] an accommodation in the performance of" the existing job); *cf. Vargas v. DeJoy*, 980 F.3d 1184, 1189 (7th Cir. 2020) ("Allowing Vargas to perform only collections would force the Postal Service to assign an essential function of his job—carrying heavy mail bags and delivering their contents— to someone else."); *Basith v. Cook County*, 241 F.3d 919, 928–30 (7th Cir. 2001) (holding that the duty of reasonable accommodation did not require the employer to waive a pharmacist's delivery responsibilities, even where delivery required only a limited amount of time and other employees could theoretically perform the function on the plaintiff's behalf); *Malabarba v. Chi. Trib. Co.*, 149 F.3d 690, 700 (7th Cir. 1998) ("[I]t would be unreasonable for Malabarba to have expected the Tribune to separate the automatic lift operator task out of the multi-duty inserting packager position.").

### A.    Frank Donis, Lucy DiGioia, Barbara Tague, and Tamika Barker

Plaintiffs Donis, DiGioia, Tague, and Barker insist, in broad strokes, that they can perform the essential functions of their CO or DS jobs.  (Pls.' Resp. at 7–14.)  But their argument

---

[7]    Defendants describe the basic issue succinctly in their reply brief: "[a]lthough Plaintiffs repeatedly protest that there are *assignments* that do not require use of force, lifting or responding to emergencies, the DS and CO *positions* certainly require these functions."  (Defs.' Reply [116] at 12.)

presupposes that it would be acceptable for each Plaintiff to be given assignments that require them to perform just a subset of a CO's or DS's essential functions. As discussed above, Plaintiff Barker's doctor stated that Barker, a CO, could not work closely with detainees, defuse disruptive behavior, search inmates to detect and confiscate contraband, prepare inmates for transportation, or transport inmates outside of the facility. Plaintiff DiGioia's doctor stated that DiGioia, a DS, could not have a "physical encounter" with detainees, could not wear a full duty belt or bulletproof vest, needed to take breaks, and could not perform security functions that involve bending, crouching, kneeling, running, lifting, or twisting.[8] Plaintiff Donis's doctor stated that Donis, a CO, could not stand for long periods of time, could not lift over 10 pounds, could not climb stairs or ladders, could not squat or walk quickly, needed to use a cane and a knee brace, could not have direct contact with inmates, and could not be available to work in particular locations or on consecutive shifts based on operational needs. And Plaintiff Tague, a DS, submitted documents to Defendant Reierson indicating that she could not carry a firearm. On summary judgment, Plaintiffs have articulated no accommodation for such restrictions that the CCSO could have offered at the time such information was submitted—other than to give Barker, DiGioia, Donis, and Tague work assignments that systematically exclude some of the essential functions for their respective position (e.g., sedentary administrative work).

While that kind of accommodation might be reasonable in some work environments, it is not so in this one. Permanent, limited assignments are not allowed by CCSO policy. To satisfy the CCSO's operational and staffing needs, each CO or DS must be able to rotate through any assignment for their position. (DSOF ¶¶ 26, 30.) Plaintiffs have not directly challenged that policy, nor would they find success in contending that it is unreasonable. The Seventh Circuit has held,

---

[8] As discussed above, DiGioia's physician later submitted an updated medical note that stated DiGioia no longer had any work restrictions. As a result, DiGioia remains in her position as a DS and retains the same pay and benefits. Since DiGioia cannot claim any adverse employment action subsequent to the updated medical note, the court presumes that her ADA claims are based on the time period in which she had the medical limitations noted here.

in several cases, that an employer may require employees to rotate through various assignments where there is a legitimate rationale for the requirement.

In *Miller v. Illinois Department of Corrections*, 107 F.3d 483, 484 (7th Cir. 1997), a correctional officer sought a reasonable accommodation after experiencing a severe loss of vision. The plaintiff insisted that she could still perform some of a correctional officer's duties, including positions at a switchboard and in an armory. *Miller*, 107 F.3d at 484–85. But the plaintiff could not satisfy the rotation requirement, which the court, affirming summary judgment for defendant, found reasonable. *Id.* at 485. A detention facility "has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have experience in the positions, such as searching and escorting inmates, that provide the necessary training and experience for responding effectively to a riot, as well as the capability for such response." *Id.* Given the plaintiff's disability, she was not able to rotate through assignments as needed to perform the functions of a correctional officer. *Id.* at 485–87.

The Seventh Circuit discussed a similar rotation requirement, and expanded on *Miller*'s reasoning, in *Dargis v. Sheahan*, 526 F.3d 981 (7th Cir. 2008). In *Dargis*, a correctional officer who had suffered a stroke sought a reasonable accommodation when he returned to work for the CCSO after disability leave. *Dargis*, 526 F.3d at 983. The plaintiff's doctor submitted paperwork stating that, among other limitations, he could not come into physical contact with detainees. *Id.* The plaintiff insisted he could still perform the essential functions of a correction officer "if he is assigned to a position requiring no inmate contact, including the prison's entrances and exits, tower, control center, records department, computer room, or firing range." *Id.* at 986. The court rejected that argument: "there are many . . . duties that include disciplining prisoners, inspections, intervening in disputes, and dealing with routine but sometimes tense situations that cannot be subtracted from the performance expectations of a correctional officer." *Id.* at 987. As in *Miller*, the plaintiff failed to propose a reasonable accommodation that could be reconciled with the

employer's reasonable requirement that a correctional officer be able to rotate through any assignment. *Id.* at 988.[9]

Plaintiffs do not offer a satisfying response to these cases. For example, they argue that, unlike their counterparts in *Miller* or *Dargis*, they "have all been not only actually working as CO's and DS's with permanent restrictions, [but] they have each been doing so successfully for a long time." (Pls.' Resp. at 9.) This effort to distinguish *Miller* and *Dargis* underscores Plaintiffs' primary argument in opposition to summary judgment. Plaintiffs contend that the "glaring hole" in Defendants' motion is "that it completely ignores that each one of these Plaintiffs has, in fact, been performing the essential functions of their jobs for months and/or years just fine, until, suddenly, they all received options letters." (*Id.* at 7.) According to Plaintiffs, the fact that the CCSO previously permitted some COs and DSs to work in modified assignments indefinitely must mean that Plaintiffs were performing the essential functions of their positions then, and that Plaintiffs can therefore perform the essential functions of their positions today.

Plaintiffs' argument that Defendants' past practice controls, even in light of Defendants' current policy, is contrary to law in this circuit. In *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 852 (7th Cir 2015), United Airlines had a practice of making a particular light-duty "Matrix" position available only to workers with medical restrictions. In 2011, in an effort to apply the collective bargaining agreement uniformly to all positions, United changed its policy to allow all workers to bid for the Matrix position, with final selection based on seniority. *Dunderdale*, 807

---

[9]        Although *Miller* and *Dargis* provide close factual analogues to this case, it is worth noting that rotation requirements have been upheld in other types of work settings, as well. *See, e.g.*, *Gratzl*, 601 F.3d at 677 (upholding requirement that court reporters rotate through various live courtrooms, as well as the control room, in order "to evenly distribute the workload that varied with each courtroom"); *Watson*, 304 F.3d at 751 ("Rotation not only reduces the risk of injury caused by long-term repetition of particular motions but also, by qualifying every worker to perform each task on the line, facilitates production by making it easier for the firm to substitute among workers when some go on vacation or fail to appear without warning."); *Malabarba*, 149 F.3d at 700–01 (noting the importance of having each employee "trained on every aspect of the [packager] job" because "[i]f one packager is absent, and only Malabarba is available to fill in as a replacement, yet he is physically incapable of doing so, the timing of the Tribune's all-important delivery system breaks down").

F.3d at 852.  The plaintiff, Dunderdale, had previously worked in the Matrix position, but did not have sufficient seniority to keep the position after United changed its policy.  *Id.*  Dunderdale sued and argued that United failed to accommodate him by allowing him to stay in the Matrix position. *Id.* at 854.  The court held that "employers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the position or job structure should be eliminated."  *Id.* at 855–56.  And the court found that United had a legitimate business purpose for changing the structure of the Matrix position's bidding system to conform with the seniority bidding system in the collective bargaining agreement.  *Id.* at 856.

In *Gratzl*, the State of Illinois eliminated the "Court Reporting Specialist" job title and thereafter required all court reporters to rotate through courtrooms.  *Gratzl*, 601 F.3d at 677.  The plaintiff, a court reporter who suffered from incontinence, had previously been permitted to work only in the control room, which allowed easier access to restroom facilities.  *Id.*  The court rejected the plaintiff's argument that in-court reporting is not a necessary qualification for the job, because it was "indisputable that with the 2006 elimination of specialist positions, in-court reporting became a necessary function."  *Id.* at 679–80.  The court stated that the plaintiff "cannot prove that she is qualified for her current job simply by citing evidence that she was qualified for a previous job, with different essential functions, that has been eliminated."  *Id.* at 680.  The business justification for the elimination—"to evenly distribute the workload that varied with each courtroom"—was not undermined by the plaintiff's argument that she was previously allowed to work only in the control room.  *Id.* at 677, 680.  Further, "although other court reporters have been allowed to work in the control room exclusively on a temporary basis during pregnancy or to recover from injury or operation . . . this would not create an obligation that [the employer] accommodate [the plaintiff] with a permanent control-room position."  *Id.* at 681.

*Bilinsky v. American Airlines, Inc.*, 928 F.3d 565, 567 (7th Cir. 2019) is similar.  In that case, the plaintiff had been permitted to work from home for several years.  But as a result of a

corporate merger, "[t]he nature of [plaintiff's] team's work evolved from independent activities (curating content on a website, responding to written questions from employees, etc.) to team-centered crisis management activities, involving frequent face-to-face meetings with team members on short notice to coordinate work." *Bilinsky*, 928 F.3d at 571. The court held that, even though the employer "did not have a written job description that it updated to reflect new circumstances," the essential functions of the plaintiff's job had changed post-merger. *Id.* at 571–72.

This caselaw is instructive in the context of this case. In 2017, the CCSO began to experience severe staffing challenges as a result of budgetary constraints. Soon thereafter, in the fall of 2018, Defendants began enforcing the requirement that each CO and DS be able to rotate through every assignment, which requires them to perform all essential functions of their position.[10] As the cases above illustrate, such a decision is not unlawful merely because it reflects a departure from prior practice, as Plaintiffs appear to believe. Plaintiffs could not perform the CO or DS essential functions unless they could rotate assignments—including assignments with

---

[10] At various points, Plaintiffs suggest that Defendants did not uniformly impose this requirement in 2018, because some COs and DSs still remain in permanent modified-duty assignments. (*See, e.g.*, Pls.' Resp. at 21 ("[T]he Sheriff is granting accommodations for some disabled officers, but not for others on a willy-nilly basis.").) For evidence, Plaintiffs cite to deposition testimony in which Plaintiffs stated that some officers remained in modified-duty assignments. (PSOFR ¶ 113; *see, e.g.*, Barker Dep. at 139:16–21 ("We have positions within CCDOC where officers have no inmate contact at all doing their jobs. . . . They still operate that way every single day.").) But Plaintiffs have presented no evidence that these officers are working modified-duty assignments *permanently*; Defendants do not contest that modified assignments are available to employees with temporary disabilities, and Plaintiffs are unaware what medical limitations the officers in question may have. (*See* Barker Dep. at 146:17–19 ("That will be a violation of their HIPAA rights. I wouldn't know that information."); Donis Dep. at 85:13–14 ("I don't know anybody's personal medical issues."); Leibas Dep. at 72:4–6 ("Whatever their situations are, that's their personal business. I don't—I can't account to that.").) Plaintiffs' testimony is insufficient to create a genuine issue of material fact concerning the rotation policy. *See Dargis*, 526 F.3d at 987–88. Finally, Plaintiffs argue that since DiGioia and Donis remain in modified duty assignments, they are themselves evidence of the alleged "wild inconsistency." (Pls.' Resp. at 21.) As noted above, however, DiGioia no longer has any medical limitations, and Donis is in a temporary modified-duty assignment. Their situations do not rebut Defendants' assertion that the CCSO is in the process of transferring all COs and DSs to other positions if they have permanent medical restrictions preventing them from rotating assignments.

detainee contact and assignments that required the use of a firearm—with or without a reasonable accommodation. As Donis, Digioia (for a period of time), Tague, and Barker could not perform all the essential functions for their respective positions, they are not qualified individuals.[11]

### B. Irma Leibas

Defendants argue that Leibas, too, is not a qualified individual.[12] (Defs.' Mem. in Supp. at 10.) Specifically, Defendants note one of Dr. Aloman's listed accommodations—that Leibas needs to take three additional breaks per shift—and argue that this "would require CCSO to waive CO essential job functions." (*Id.*) But Defendants do not specify which essential job functions are in conflict with Leibas's need to take extra breaks, and it is not apparent to the court that a conflict exists. Defendants simply argue that the breaks "would cause [a] safety issue for her and others," without any elaboration. (*Id.* at 22.) Absent some further explanation, the court cannot agree with Defendants that, as a matter of law, extra breaks are not a reasonable accommodation for Leibas to work as a CO. *Cf. Gratzl*, 601 F.3d at 682 (holding that the employer's suggested

---

[11] Given this conclusion, the court need not address the other elements of their ADA discrimination and failure to accommodate claims. Plaintiffs contend that the evidence shows each of them has "a physical or mental impairment that substantially limits one or more major life activities." *See* 42 U.S.C. § 12102(1)(A). Apart from their actual physical limitations, Plaintiffs emphasize that they were "regarded as" disabled, and thus meet that alternative definition of disability under 42 U.S.C. § 12102(1)(C). (*See* Pls.' Resp. at 14–16.) Significantly, an employer "need not provide a reasonable accommodation . . . to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section." 42 U.S.C. § 12201(h); *see Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 n.4 (7th Cir. 2013) ("The amendments to the ADA clarified that employers needn't provide reasonable accommodation to a 'regarded as' disabled individual.").

To the extent they contend they are indeed disabled, Plaintiffs must also show that they suffered an adverse employment action separate from the alleged failure to accommodate. *See Avet v. Dart*, No. 14 C 4555, 2016 WL 757961, at *6 (N.D. Ill. Feb. 26, 2016) ("Evidence of non-accommodation . . . cannot do 'double duty' as evidence of an adverse employment action."). It is not clear that all of the Plaintiffs can make such a showing. DiGioia and Donis remain in their positions and retain their same level of pay. Tague took disability leave, which her doctor believed would allow her to rest and return to her DS role without any restrictions. Only Barker, who allegedly took a demotion to Administrative Assistant II after Reierson told her she could not remain a CO, has provided specific evidence of adverse employment action.

[12] Defendants have not argued that Leibas failed to show she is "disabled" under the ADA. (*See* Defs.' Mem. in Supp. at 10–11.)

accommodation, which included allowing the plaintiff to take extra breaks, was reasonable). And Dr. Aloman stated that, so long as Leibas can take those breaks (and wear gloves and a jacket, which Defendants do not discuss), Leibas can perform the essential functions of her job. Thus, there remains a genuine issue of material fact regarding whether Leibas is a qualified individual.

Defendants also argue that Leibas has not suffered an adverse employment action, and that she has failed to show such an action was based on her disability. Defendants argue that Leibas is "still employed in [her] CO . . . position[ ], and [her] pay and benefits have not changed." (*Id.* at 12.) That argument is in direct conflict with Defendants' own statement of fact that "Leibas is currently not working and has not received a payroll check from CCSO since March 2019," and that her "pension disability benefits have expired." (DSOF ¶ 103.) Though Leibas has "not been terminated from employment at CCSO and remains in her CO title" (*id.*), Defendants' refusal to allow her to return to work as a CO, and thereby return to CCSO payroll, amounts to an adverse employment action. *Cf. Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 704 (7th Cir. 2012) ("Being forced to take an unpaid leave of absence certainly falls into the first category of material adverse employment actions.").

Defendants next argue that as Leibas has "not provided any evidence of similarly situated employees from which the court can infer discrimination," her "claims must fail" due to the lack of causation. (Defs.' Mem. in Supp. at 14.) This argument reflects a misunderstanding of the need for evidence of "similarly situated" persons; such evidence is useful, as part of the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as a way of zeroing in on the motivation for adverse action. But offering such evidence is not the only method of showing causation. *See Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). In this case, there is no dispute about the reason for Reierson's refusal to allow Leibas to work as a CO: it was because of Leibas's disability. As discussed above, Leibas received the options letter in September 2018, but her physician, Dr. Aloman, was unable to discuss work restrictions at that time because Leibas

28

was out of work on disability. In May 2019, after Leibas had returned to work for a brief period, Leibas submitted the reasonable accommodations paperwork in which Dr. Aloman relayed that Leibas could perform all essential job functions with certain accommodations, including extra breaks. Over the next several months, Leibas and Reierson struggled to engage in a meaningful interactive process, a struggle that each side blames on the other. But it is undisputed that by November 2019, Reierson had communicated to Leibas that there was *no* reasonable accommodation that would enable her to perform the essential functions of the CO position. Thus, the evidence strongly suggests that any such engagement in an interactive process by Leibas would be futile, and that Defendants would never have allowed her to return to work as a CO, because Defendants believed that her disability categorically precluded such work.

In sum, there remain questions of material fact regarding Leibas's ADA discrimination and failure to accommodate claims. Based on the evidence provided, Leibas can show she was disabled; Defendants failed to accommodate her by allowing her to work as a CO with extra breaks, a jacket, and gloves; Leibas could otherwise perform the essential functions of the CO position; and Defendants prevented Leibas from returning to work because of her disability. Thus, Leibas's ADA claims survive Defendants' motion for summary judgment.

## III.  Equal Protection Claims

Defendants also move for summary judgment on Plaintiffs' two constitutional claims brought under 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must show that they were "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Village of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). "Disabled individuals, like any class, are protected by the Equal Protection Clause of the Fourteenth Amendment." *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 737 (7th Cir. 2000). State action alleged to discriminate against disabled individuals is subject to rational basis review. *Id.* at 737–38. An allegedly discriminatory state action survives this form of scrutiny " 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.' . . . [A]ny rational

basis will suffice, even one that was not articulated at the time the disparate treatment occurred." *Srail v. Village of Lisle*, 588 F.3d 940, 946–47 (7th Cir. 2009) (quoting *City of Chicago v. Shalala*, 189 F.3d 598, 605 (7th Cir. 1999)). "The burden is on the challenger 'to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (quoting *Srail*, 588 F.3d at 946).

Plaintiffs allege, in the first § 1983 claim, that Defendant Reierson deprived them of their equal protection rights by subjecting them, under the guise of the ADA accommodations process, to a fitness-for-duty examination that non-disabled COs and DSs did not need to complete. (Second Am. Compl. (hereinafter "SAC") [61] ¶¶ 64–65.) In the second claim, brought under *Monell*, Plaintiffs allege that Defendant Dart, who has final policymaking authority for the CCSO, has adopted a policy, practice, or custom of subjecting disabled COs and DOs to what Plaintiffs characterize as a sham accommodations process. (*Id.* ¶¶ 68–76.)

Plaintiffs have not overcome the high bar they face under rational-basis review. Each Plaintiff was subject to a similar pattern of conduct by Defendants, who attempted to engage them in an interactive process to determine whether their disabilities could be reasonably accommodated in their current CO and DS positions. It is undisputed, of course, that Defendants' actions targeted employees with various physical limitations. But Defendants have furnished a rational basis for doing so: given the CCSO's ongoing staffing challenges, which had been aggravated by recent budget cuts, Defendants wanted to ensure that each CO and DS could perform all the essential functions of their job. To do this, Defendants contacted every employee who they knew had a permanent medical restriction affecting their ability to perform those functions.

On summary judgment, Plaintiffs have not articulated a reasonable alternative interpretation of the record. They argue that Defendants' actions had no rational basis because they "all stemmed from a desire to save money, and had nothing to do with performance of essential job functions, safety, operational need, or any other alleged basis." (Pls.' Resp. at 29.)

But Plaintiffs' only citation is to a summary of Bradley Curry's September 2018 memorandum (*see* DSOF ¶ 44), and that memorandum plainly contradicts their theory that the CCSO acted based on an illegitimate "desire to save money."[13]  Curry (the CCSO's chief operating officer) emphasized that a sworn officer's "inability to work on tiers or respond to emergency incidents puts an undue burden on their fellow officers, as the assignments of correctional officer requires them to be able to respond to emergencies and be capable of physically protecting the safety and security of the staff, inmates, and facility."  (Curry Mem. at 1.)  In order to alleviate these reasonable concerns, Curry requested that the HR department "examine the assignments that sworn officers are currently serving in that do not require the performance of a sworn officer."  (*Id.*)

Defendants have testified that they were following this general directive when they took the actions that Plaintiffs have alleged to be unconstitutional.  Because Plaintiffs have not created a genuine dispute regarding the basis for Defendants' conduct, the court rejects their equal protection claims.

## IV.  DiGioia's FMLA Retaliation Claim

Employers are prohibited from retaliating against an employee who exercises or attempts to exercise rights under the Family and Medical Leave Act.  29 U.S.C. §§ 2615(a)(2), (b).  If an employee takes FMLA leave, the employer may not use that "as a negative factor in hiring, promotions, or disciplinary actions."  *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008).  "Retaliation claims under the FMLA . . . require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action."  *Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).

---

[13]  It is also worth noting that Plaintiffs provide no legal support for the contention that a "desire to save money" cannot be a legitimate governmental purpose.  The court would expect responsible public officials to exercise care in their stewardship of the public fisc.

31

Defendants argue that DiGioia did not suffer an adverse action because she was granted FMLA leave, and she retains her position as a DS with the same pay and benefits. (Defs.' Mem. in Supp. at 28.) DiGioia's response to this argument is not clear, but she appears to argue that the request by Defendants for DiGioia's updated medical limitations was itself an adverse action that would dissuade a reasonable employee from exercising rights under the FMLA. (*See* Pls.' Resp. at 31–34.) DiGioia states that *Lewis v. School District #70*, 523 F.3d 730 (7th Cir. 2008), is "on point." (Pls.' Resp. at 33.) In *Lewis*, a bookkeeper for a school district took intermittent FMLA leave and was then asked to either resign or accept a demotion to a position with a much lower salary. *Lewis*, 523 F.3d at 734–37. Again, DiGioia was not made to resign or accept a demotion—she retains her same title and pay—and nothing in *Lewis* supports her theory that Reierson's request for updated medical limitations is an adverse employment action. DiGioia next argues that "[c]ourts have also found that, for example, a reassignment to a less favorable position may constitute an adverse action for FMLA purposes." (Pls.' Resp. at 33.) As DiGioia was not reassigned, the cases she cites for that argument are irrelevant.

In addition, DiGioia does not present evidence of causation beyond the fact that a person from HR asked DiGioia about her ADA accommodations "immediately" after DiGioia requested FMLA leave in the fall of 2019. (*See* Pls.' Resp. at 32.) Suspicious timing is of course "by itself rarely . . . enough to overcome summary judgment." *See Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020). In this case, there is nothing suspicious about the timing of the request. DiGioia had been asked about her medical restrictions several times previously and had not provided the requested information. There is no evidence that the request itself was retaliatory.

## VI.   Cook County

Defendants also seek summary judgment on Plaintiffs' indemnification claim against Cook County (Count VI). For the reasons discussed above, the court grants summary judgment for Cook County on most claims, because there is no underlying liability and therefore nothing to

32

indemnify.  The court denies summary judgment solely as to Plaintiff Leibas's ADA discrimination and failure to accommodate claims, which survive this motion.

<u>**CONCLUSION**</u>

Defendants' Motion for Summary Judgment [94] is granted except as to the ADA discrimination and failure-to-accommodate claims of Plaintiff Leibas.  With respect to that claim, the parties are encouraged to discuss settlement and are directed to submit, within 21 days, a written status report including (if necessary) proposed trial dates.

ENTER:

Dated:  March 31, 2022

_____
REBECCA R. PALLMEYER
United States District Judge