**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IRMA G. LEIBAS, FRANK DONIS, LUCY DiGIOIA, BARBARA TAGUE, and TAMIKA BARKER, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 19 CV 7592 |
| THOMAS J. DART, Sheriff of Cook County (Official Capacity), and COUNTY OF COOK, a unit of local government as indemnitor, | ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Until the spring of 2019, Plaintiffs Irma Leibas and Barbara Tague worked for the Cook County Sheriff's Office (CCSO) as a Correctional Officer (CO) and Deputy Sheriff (DS), respectively. Leibas and Tague, along with other individuals whose claims have since been dismissed from this matter, brought this suit against Defendants—Thomas J. Dart, the Sheriff; Rebecca Reierson, an HR director; and Cook County—for alleged violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), in addition to other claims. Earlier this year, the court granted Defendants' motion for summary judgment on all claims brought by Plaintiffs, except for Leibas's ADA claims. *See Leibas v. Dart*, No. 19 C 7592, 2022 WL 971519 (N.D. Ill. Mar. 31, 2022). Plaintiff Tague now asks the court to reconsider that ruling, arguing that her ADA claims, too, should proceed to trial. Defendants also move the court to reconsider its partial denial of summary judgment, arguing that undisputed evidence demonstrates that Leibas's ADA claims, like the other Plaintiffs', fail as a matter of law. For the reasons explained below, the court grants Defendants' motion [129]. The court enters and continues Tague's motion [127] and grants Tague fourteen days to present evidence that her inability to raise a firearm to shoulder

level does not impede her ability to physically restrain a person, which is an undisputed essential function of the DS job.

## BACKGROUND

The court assumes familiarity with the facts of this case as detailed in its March 31, 2022 memorandum and order [124] and limits its discussion here to facts relevant for resolving the parties' motions for reconsideration.

### I.  Barbara Tague

Barbara Tague worked at the Criminal Courts Building (CCB) as a DS beginning in about 1995.  (Pls.' Local Rule 56.1 Statement of Facts Response (hereinafter "PSOFR") [109] ¶ 119.) DSs are deputized, sworn peace officers who work in the CCSO Court Services Department. (Defs.' Local Rule 56.1 Statement of Material Facts (hereinafter "DSOF") [96] ¶¶ 10, 14, 29.)  DS assignments include providing courtroom security, working in the detainee lockup area, conducting security screening at building entrances, and providing roving security throughout the building.  (*Id.* ¶ 14.)  Regardless of assignment, a DS's primary responsibility is to maintain security and order in the courthouse and to effectively communicate and engage with persons in custody, staff, and the public, which may, at times, require the use of physical restraint.  (*Id.* ¶ 29.)

The CCSO has identified what it considers to be key duties of all DSs in an "Essential Functions Checklist," which it issued in January 2018.  (*Id.* ¶ 30.)  The listed essential functions include maintaining security and order in courthouses; effectively communicating and engaging with detainees, staff, and the public; using physical force if necessary to maintain safety and security; supervising detainees; operating entry screening equipment; responding quickly to emergency situations, which includes bending, crouching, kneeling, running, lifting, and twisting; wearing a duty belt and carrying a firearm; and writing narratives and entering data into computer systems.  (*Id.*; Job Description – Essential Job Functions (Deputy Sheriff), Ex. C to Bellettiere Decl., Ex. 3 to DSOF (hereinafter "DS Essential Functions Checklist") [96-3].)  The amount of time

a DS spends on a particular function may vary depending on his or her current assignment. (DSOF ¶ 30.)

Plaintiff Tague does not dispute that maintaining security, having the ability to physically engage with others when necessary, and responding quickly to emergency situations are essential job duties. (*See* PSOFR ¶¶ 29, 30.) Tague does, however, challenge Defendants' assertion that all of the duties listed in the "Essential Functions Checklist" are bona fide essential functions of the DS position at CCB. She contends that rotating through assignments is not an essential function, because, for all the decades that Tague worked as a DS at CCB, she has only ever worked in courtrooms. (PSOFR ¶¶ 30, 119.) Relatedly, she disputes that being qualified to carry a weapon is an essential function and asserts that not all assignments require or even allow DSs to carry firearms. (*Id.* ¶ 30.) Indeed, it is undisputed that deputies are prohibited from carrying firearms in CCB courtroom assignments, a policy adopted as a safety measure after a detainee tried to grab a gun from a DS's holster. (*Id.* ¶ 120.) Tague has never carried a firearm in the courtroom where she has been assigned. (*Id.*)

Tague testified that she is disabled due to arthritis in both of her shoulders, as well as stress and anxiety.[1] (DSOF ¶ 105.) On March 27, 2019, at required in-service training, Tague was unable to lift her weapon due to her shoulder arthritis and torn rotator cuffs. (*Id.* ¶ 106.) As a result, she failed her annual firearm qualification. Tague testified that, until 2019, she had successfully completed the CCSO annual training every year since 1994. (Tague Dep., Ex. 11 to DSOF [96-11] (hereinafter "Tague Dep.") at 49:10–23.) A few days after she failed to qualify, on April 2, 2019, Tague contacted the CCSO Director of Employment Services, Rebecca Reierson, and submitted a written request for reasonable accommodation. (DSOF ¶ 107.) Specifically, Tague sought an assignment in which she would not be required to carry her weapon. (*Id.*)

---

[1]    Tague also testified to having arthritis in other parts of her body, including her hands, finger, and spine. (Tague Dep. at 95:15–20.)

On April 2, 2019, Reierson called Tague to discuss her medical restrictions. (*Id.* ¶ 108.) Reierson determined that Tague's inability to carry and use a firearm meant that she could not perform the essential functions of the DS position, so Reierson sent Tague the link to an online test called the "eSkills Assessment" to see if there was an alternative position Tague was qualified to perform. (*Id.*) Tague completed the eSkills Assessment on April 12, 2019, but then, one week later, withdrew her ADA accommodation application because she believed that she would be able to carry a firearm once again if she rested, took medication, and completed physical therapy. (*See id.* ¶ 110; Tague Dep. at 97:9–15.) Tague believed that unless she was able to clear her restrictions, her only options were to take the eSkills Assessment, which would result in a demotion, or to go on disability leave, which would result in a fifty percent pay cut. (*See* PSOFR ¶ 121.) On April 22, 2019, Tague elected to go on disability leave. (Tague Dep. at 42:21–23.) She has not returned to work, though she remains listed as a CCSO employee and retains her DS title. (PSOFR ¶ 111.) Tague has not presented evidence of whether there has been any change in her arthritis, stress and anxiety conditions.

## II.    Irma Leibas

Irma Leibas began working as a CO in 2010. (Leibas Dep., Ex. 10 to DSOF (hereinafter "Leibas Dep.") [96-10] at 19:17–20.) COs primarily work in the Cook County Department of Corrections (CCDOC) detention facility, where their central responsibility is ensuring the safety and security of staff, inmates, and visitors. (DSOF ¶ 12; Burke Decl., Ex. 2 to DSOF [96-2] ¶ 12.) Security incidents and disruptions occur in the CCDOC daily. (Burke Decl., Ex. 2 to DSOF [96-2] ¶ 14.) Many of these incidents require the use of force: between May 18, 2018 and May 18, 2021, CCDOC personnel responded with force to approximately 2,879 incidents. (*Id.* ¶ 12.)

The CCSO also maintains an "essential functions" checklist for COs, which it published in 2015 and revised most recently in July 2017. (DSOF ¶ 25.) Although Plaintiffs at summary judgment suggested broadly that the CO checklist does not consist of the "true essential functions" for the position (PSOFR ¶ 25), they did not create a genuine dispute of fact about any

specific items on the essential functions list, which include the following: working closely with and monitoring detainees; defusing disruptive behavior verbally and, if needed, physically; searching detainees and their living quarters; transporting detainees; processing new admissions; writing narrative reports and filling out logbooks; and participating in training required by the CCSO.  (*Id.*; Job Description – Essential Job Functions (Correctional Officer), Ex. 4 to Burke Decl., Ex. 2 to DSOF [96-2] at Plaintiff 217.)  The amount of time that a CO spends performing any one function varies based on the CO's current assignment and the facility's then-current operational needs.  (DSOF ¶ 27.)[2]

Leibas suffers from Raynaud's Syndrome, scleroderma, lupus, and irritable bowel syndrome.  (DSOF ¶ 91.)  Her conditions generate problems with blood circulation when she is under stress; when she experiences a flare-up, she has extreme fatigue and needs to limit her movement.  (*Id.*)  Between 2015 and 2018, the CCSO accommodated Leibas's medical restrictions by allowing her to have limited contact with detainees and by excusing her from working in medical dispensaries or outdoors when the temperature is below 70 degrees or above 85 degrees.  (*Id.* ¶ 92.)

Sometime in 2018—Leibas does not specify when or why—Leibas took disability leave.  (Leibas Dep. at 27:9–21.)  On September 14, 2018, while Liebas was out on leave, she received a letter from Reierson regarding her work restrictions.  (DSOF ¶ 94.)  Leibas was not the only employee to receive this letter: Reierson sent it to approximately 73 COs and DSs who had permanent medical restrictions on file that prevented them from performing one or more essential job functions, but whom CCSO had allowed, until that point, to work in their sworn role.  (*Id.* ¶ 48.)  The letter stated, in part,

> Based on the medical information on file with the Cook County Sheriff's Office (CCSO), it appears you are unable to perform one or more of the essential functions of your position. Your job description and current restrictions are

---

[2]     Plaintiffs did not respond to the statements contained in paragraphs 26, 27 and 28 of Defendants' Rule 56 statements.  (*See* PSOFR pp. 12–13.)

attached.  To continue in your current job title, you must be able to perform the essential functions, with or without a reasonable accommodation.

(*Id.* ¶ 49.)

The letter then gave recipients three options:  They could (1) present updated medical records to HR, showing that they could perform the essential functions of their positions with or without a reasonable accommodation; (2) request a reasonable accommodation under the ADA; or (3) if unable to perform the essential functions of their positions under the two other options, "take a skills assessment to determine if [they] qualify for another vacant position at the CCSO."  (*See id.*)  The letter required a response within 14 days.  (*Id.*)

Leibas's testimony regarding how she responded to this letter is inconsistent.  At first, Leibas testified that she took no action in response to the letter other than forwarding it to her attorney.  (Leibas Dep. at 140:2–18.)  She did, however, email Reierson soon after receiving the letter, and the two discussed how Leibas could seek ADA accommodations to return to work, but, for reasons that are not entirely clear, Leibas did not submit that paperwork in the fall of 2018.[3] (*See* Leibas Dep. at 171:23–178:9.)  Leibas remained on disability leave and, in February 2019, sought to return to work, but was unsure if she could place a bid for a work assignment, given her medical restrictions.  (*See id.* at 113:13–119:24.)  Leibas did end up placing a bid, and she returned to work for a few weeks in March 2019.  (*See id.* at 122:9–123:6.)  She then left to go on disability leave again.  (*See id.* at 123:4–6.)

On May 6, 2019, Leibas emailed Reierson to inquire about vacant positions at the CCSO.  (DSOF ¶ 97.)  The record does not reflect whether or how Reierson responded to Leibas's email.  (*See* DSOF ¶ 97; PSOFR ¶ 97; Leibas Dep. at 126:14–23, 130:11–18.)  On May 29, 2019, Leibas submitted a written request for reasonable accommodations, completed by her physician, Dr. Monica Aloman.  (DSOF ¶ 98.)  In that submission, Dr. Aloman stated that Leibas could perform

---

[3]     When asked, upon presentation of these emails, whether Leibas took any additional steps to complete her ADA accommodation paperwork after receiving the September 14, 2018 letter, Leibas said she responded by hiring counsel.  (*See* Leibas Dep. at 178:3–9.)

all essential CO job functions with accommodations.  (Ex. 82 to Leibas Dep. at Defendants 4420.)

Dr. Aloman listed several necessary accommodations, including allowing Leibas to take up to

three additional, unplanned breaks of "indefinite" duration per shift.  (*Id.* at Defendants 4419.)

The record does not make clear the details of Leibas's interactions with Reierson or others

at CCSO after May 2019.  It appears that Leibas sought accommodations that would allow her to

stay in the CO role, but CCSO officials informed her in July that the accommodations Dr. Aloman

listed would interfere with the job's essential functions; instead, officials provided her instructions

for finding an alternative position at CCSO.  (*See* Leibas Dep. at 207:19–212:2.)  Like Tague,

Leibas refused to take the eSkills Assessment because she believed doing so would result in a

demotion.  (*See id.* at 208:1–8.)

At some point—it is unclear exactly when—Leibas stopped responding to CCSO

communications and instead directed Reierson to speak to her attorney.  (*See, e.g.*, DSOF ¶ 99.)

The most recent exchange in the record occurred on November 11, 2019, when Reierson again

explained that there was no reasonable accommodation that would enable Leibas to perform the

essential functions of the CO position, and that it was therefore important for the CCSO to

determine whether Leibas was qualified for an alternative position.  (Ex. 84 to Leibas Dep. at

Defendants 6888.)  The email provided Leibas with instructions for taking the eSkills Assessment.

(*See id.*)  Leibas did not respond and did not take the assessment. (DSOF ¶ 102.)  Leibas has

not returned to the workplace since March 2019 (*id.* ¶¶ 96, 103), and it is unclear from the record

whether, how, or when Leibas might return to work.

## III.    Summary Judgment Order

On May 21, 2021, Defendants moved for summary judgment on all claims, making eight

arguments.  Two of those arguments are relevant here: (1) CCSO did not violate the ADA because

Plaintiffs were not qualified individuals, did not suffer adverse employment action, and were

treated the same as similarly situated employees; and (2) Plaintiffs' failure to accommodate

claims fail because no reasonable accommodation exists that would allow them to remain in their positions and they did not engage in the interactive process.

On March 31, 2022, this court granted summary judgment to Defendants on all claims except Plaintiff Leibas's ADA claims. *See Leibas*, 2022 WL 971519, at *1. In its memorandum opinion, the court concluded that Tague was not a qualified individual under the ADA because she is unable to carry a firearm, which the court found (without discussing the matter in detail) was an essential function of the DS role. *Id.* at *11, *14. The court also noted that it was not clear that Tague could establish that she suffered an adverse employment action because she elected to take disability leave. *Id.* at *14 n.11. Regarding Leibas, the court stated it could not determine that Leibas's need for up to three additional breaks per shift renders her an unqualified individual because Defendants did not specify which essential job functions conflict with Leibas's need to take extra breaks. *Id.* at *15. The court concluded that it could not determine, as a matter of law, that extra breaks could not be a reasonable accommodation for Leibas to work as a CO. *Id.* The court also found that there were disputes of fact concerning whether Leibas could establish that she suffered an adverse employment action. *Id.*

Plaintiff Tague and Defendants now each move this court to reconsider its summary judgment order. On April 21, 2022, Tague filed her motion [127], arguing that the court erred in failing to recognize disputes of fact whether carrying a firearm and rotating through assignments are essential functions of the DS role. Tague argues that genuine disputes of material fact exist on other elements of her ADA claim, as well. On April 29, 2022, Defendants filed their own motion [129], arguing that clear evidence shows that (1) the accommodations Leibas requires conflict with the essential functions of a CO, (2) Defendants did not refuse to allow Leibas to return to work, and (3) Leibas did not suffer an adverse employment action. On May 11, 2022, the court granted the parties leave to supplement the record with evidence relevant to the parties' motions [130].

**DISCUSSION**

Motions for reconsideration are interlocutory orders governed by Federal Rule of Civil Procedure 54(b). Rule 54(b) provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." FED. R. CIV. P. 54(b); *see also Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012). Motions for reconsideration are reserved for correcting manifest errors of law or fact, or for presenting newly discovered evidence. *Dahlstrom v. Sun-Times Media, LLC*, 346 F. Supp. 3d 1162, 1167 (N.D. Ill. 2018) (citing *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996)). The court may exercise its inherent authority to reconsider its interlocutory orders any time before it enters a final judgment. *See Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 12 (1983) ("every order short of a final decree is subject to reopening at the discretion of the district judge"); *Sims v. EGA Prods., Inc.*, 475 F.3d 865, 870 (7th Cir. 2007) ("nonfinal orders are generally modifiable").

To prevail on a claim of disparate treatment in violation of the ADA, a plaintiff must prove that (1) she was disabled, (2) she was qualified to perform the essential functions of her job with or without a reasonable accommodation, and (3) her disability was a "but for" cause of an adverse employment action. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). To prevail on a failure-to-accommodate claim, a plaintiff must prove that (1) she was a qualified individual with a disability, (2) her employer was aware of the disability, and (3) her employer failed to reasonably accommodate the disability. *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). Thus, for both types of claims, a plaintiff must establish that she is a "qualified individual" under the ADA. If a plaintiff cannot do so, both claims fail.

A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); 29 C.F.R. app. § 1630.2(m). "[A] worker has

no claim under the ADA if she, even with a reasonable accommodation, cannot do the job for which she was hired" and "[i]t is irrelevant that the lack of qualification is due entirely to a disability." *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998) (quoting *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1995 (7th Cir. 1997)). Because the issue of whether Tague and Leibas are qualified individuals is central to both of their motions, the court considers it first.

## I.        Tague's Motion for Reconsideration

Tague challenges the court's conclusion that she is not a "qualified individual." (Tague's Mot. for Recons. [127] at 2–3.) Specifically, she argues that she has presented a factual dispute as to whether carrying a firearm and rotating through assignments are bona fide essential job duties of the DS position at CCB. Tague urges that she can perform the same job she has held since 1995, that she is indeed a qualified individual, and that questions of fact exist concerning the remaining elements of her ADA claims. Having again reviewed the record, the court agrees with Leibas that there is a genuine dispute whether carrying a firearm is an essential duty of the DS role. The court notes, however, that there may not be a genuine dispute as to whether Leibas can carry out *all* of the position's essential functions. Significantly, Leibas has not shown that, despite her inability to raise a firearm to her shoulders, she is still able to physically restrain persons as necessary—an undisputed essential function of the DS job.

## A.        Carrying a Firearm

Tague's primary contention is that carrying a firearm is not an essential function of the DS position as she has experienced it. Whether a particular job function is essential "is a factual question*, not* a question of law." *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016) (emphasis in original). To answer that question, courts "consider the employer's judgment, including written job descriptions, as evidence." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020). Regulations implementing the ADA identify seven non-exclusive factors to consider when determining whether a job duty amounts to an essential function:

(i)     The employer's judgment as to which functions are essential;

(ii)     Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)     The amount of time spent on the job performing the function;

(iv)     The consequences of not requiring the incumbent to perform the function;

(v)     The terms of a collective bargaining agreement;

(vi)     The work experience of past incumbents in the job; and/or

(vii)     The current work experiences of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

These factors balance the employer's judgment—which the court affords some deference—with experiences on the ground, which may counter the employer's judgment. *Tate v. Dart*, 51 F.4th 789, 794–95 (7th Cir. 2022) (collecting authority). The court will address them in turn.

**1.     Employer's Judgment**

It is the CCSO's position that carrying a weapon is an essential function for all DSs because they rotate through assignments. (Bellettierre Decl., Ex. 3 to DSOF [96-3] ¶ 9.) Additionally, the "Essential Job Functions Checklist" for the DS role lists as a major job duty: "Qualify annually with a duty weapon, and [be able] to carry and secure/retain a duty weapon while wearing a duty belt as required by CCSO policy." (Job Description – Essential Job Functions (Deputy Sheriff, Cook County Sheriff's Office, Court Services), Ex. 3 to Bellettierre Decl., Ex. 3 to DSOF [96-3] at Plaintiff 22–23.)

In her motion for reconsideration, Tague contends that the court should discount the employer's judgment in this case because Reierson testified that she did not know if DSs at CCB carry guns in courtrooms. (Tague's Mot. for Recons. at 8 (citing PSOFR ¶ 126).) Reierson is the HR director; her lack of information about the DS role and its requirements is disappointing. That lack does not, however, negate Bellettierre's declaration or the Essential Functions checklist.

Rather than discounting the employer's judgment at this stage, the court assesses whether evidence regarding the other regulatory factors counters CCSO's position. *See Tate*, 51 F.4th at 795 (noting that an employer's judgment is due some deference).

## 2.      Written Job Description

Although DSs carry out different assignments, there is only one official DS position at CCSO.  The written job description for the DS position lists as a key responsibility: "Required to carry a weapon."  (Ex. A to Bellettierre Decl., Ex. 3 to DSOF [96-3] at Plaintiff 25.)  The job description also states that a DS "[m]ust have valid FOID and complete firearm qualification annually."[4]  (*Id.*)  The written job description identifies the ability to carry a weapon as essential. Tague contends that this job description does not accurately reflect the reality for deputies working at CCB who do not carry firearms in courtrooms. But that contention is relevant to "the employer's actual practices in the workplace," *Miller v. Illinois Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011), a matter discussed below.

## 3.      Amount of Time Spent Performing the Function

As a general rule, the greater the amount of time an employee spends performing a function, the more likely it is that the function is essential.  This factor clearly favors Tague, who has presented evidence that, since she began working at CCB in 1995, she has only ever been assigned to courtrooms and never once carried a firearm during those assignments.  (PSOFR ¶ 119; Tague Supp. Decl. [133] ¶¶ 9–21.)  Furthermore, it is undisputed that "[d]eputies cannot carry weapons in courtroom assignments because there are trials ongoing with juries, witnesses, parties, attorneys, and the like, and it presents a safety risk."  (PSOFR ¶ 120.) [5]

---

[4]      Tague argues that her disability does not prevent her from having and maintaining a FOID card.  (Tague's Mot. for Recons. at 8.)  Even so, because Tague could not lift her weapon during training, she was unable to complete her annual firearm qualification, which is also a requirement.  (DSOF ¶ 106; Ex. A to Bellettierre Decl., Ex. 3 to DSOF [96-3] at Plaintiff 25.)

[5]      Defendants argues that Tague may need her weapon in an all-call situation, such as an active shooter scenario.  However, the undisputed evidence shows that DSs "bench" their weapons in lockers on a separate floor from their courtroom assignment, which leads to the

4.     **Consequences of Not Performing Function**

Courts also consider "the impact of not requiring the employee to perform the function." *Vargas v. DeJoy*, 980 F.3d 1184, 1188 (7th Cir. 2020) (citing 29 C.F.R. § 1630.2(n)(3)(iv)).  Again, this factor favors Tague.  There is undisputed evidence that, for safety reasons, deputies do not carry firearms in courtroom assignments.  (Tague's Mot. for Recons. at 8; PSOFR ¶ 120.)  Each workday for ten consecutive years, Tague reported to the CCB grand jury courtroom, where she never carried a firearm.  (Tague Supp. Decl. [133] ¶¶ 11, 21.)  Defendants contend that DS assignments change to respond to staffing needs, but they have never claimed that Tague's prior courtroom assignment has changed or would no longer be available to her, were she to return to work.  (Bellettierre Supp. Decl. [131] ¶¶ 10, 11.)  Tague's evidence tends to show that the consequences of her not carrying a firearm are very low, or that she has at least created a factual dispute on that point.

5.     **Terms of Collective Bargaining Agreement**

Collective bargaining agreements are relevant to an essential-function analysis.  *See Tate*, 51 F.4th at 798.  DSs are members of the Fraternal Order of Police (FOP) and their employment, at least at the time of discovery, is subject to the 2017–2020 FOP Collective Bargaining Agreement (CBA).  The closest the CBA comes to addressing whether carrying a firearm is a requirement of union membership is this statement: "Whenever a Deputy is required to attend in-service training (including qualifying with their weapons) it shall be the responsibility of the Sheriff/Designee to schedule such in service training without loss of pay or benefits to the affected deputy."  (Illinois FOP Labor Council, Ex. B to Bellettierre Decl. Ex. 4 to DSOF at Defendants 4026.)  This language confirms that if training is required, the employer must pay for the time devoted to training; it does not establish that in-service training always includes qualifying with a weapon nor that all DSs must, in fact, do so.  Tague acknowledges that firearms are mentioned

---

inference that Tague likely would be unable (or, at least, not expected) to leave her courtroom assignment to fetch her firearm in such an emergency.  (*See* Tague Supp. Decl. [133] ¶ 22.)

in two provisions relating to training in the CBA but contends that "that language does not make [the ability to carry firearms] an 'essential' function or otherwise." (Tague Mot. [127] at 8.) The court agrees; the CBA does not speak to whether carrying a firearm is an essential function for all DSs.

6.      **Work Experience of Past Incumbents in the Job**

The remaining categories in the essential-functions analysis look to "the employer's actual practice in the workplace." *Miller*, 643 F.3d at 198. Tague marshals her strongest evidence on this point. For at least 10 consecutive years while working as a DS at the CCB, Tague worked only in the Special Grand Jury Room. (Tague Supp. Decl. [133] ¶ 11.) She has never rotated to a different assignment. (*Id.* ¶¶ 9–15.) She has never carried a gun in the Special Grand Jury Room during her assignment. (*Id.* ¶ 21.) A supplemental declaration provided by another DS at the CCB supports Tague's contention that several DSs at that building tend not to rotate assignments daily. (Ranney Decl. [133-1] at ¶¶ 3–4.)

7.      **Current Work Experience of Incumbents in Similar Jobs**

Although the experience of current incumbents in similar jobs is not as important as the other factors, courts may consider such information. *See Tate*, 51 F.4th at 799. Tague has presented evidence that Anthony Kolaski, a DS who works at the Daley Center, a different courthouse in Chicago, did not carry a weapon in the course of his duties from 2013 to 2019. In his supplemental declaration, Kolaski stated that he did not carry his weapon "due to a medical condition." (Kolaski Decl. [133-2] ¶ 2.) He further declared that DSs at the Daley Center "may carry weapons in courtrooms, but are not required to do so." (*Id.* ¶ 8.) Defendants have not rebutted this evidence, which again undermines the assertion that the ability to carry a weapon is an essential function.

Evidence relating to these factors create a genuine dispute regarding whether the ability to carry a firearm is an essential function of the DS position. The majority of the regulatory factors

weigh in her favor. If carrying a firearm were the only disputed essential function in this case, it would be appropriate to send Tague's case to a jury.

## B.    Physical Restraint

From Tague's perspective, that concludes the inquiry. She asserts that "there is no dispute that [she] can do each and every other function listed in the job description because none of them are at issue in this case." (Tague's Mot. for Recons. at 8.) The court is far less certain. Defendants proffered evidence that "[r]egardless of assignment, a DS's primary responsibility is to maintain the security and order of the courthouse and to effectively communicate and engage with persons in custody, staff, and the public, which at times may require the use of physical restraint." (DSOF ¶ 29.) Plaintiffs did not respond to this statement or to other factual statements concerning the physically demanding nature of the DS job. (PSOFR ¶ 29 (addressing only firearms and rotation); *see also* PSOFR ¶¶ 30, 32, 40.) In their opening summary judgment brief, Defendants cited undisputed evidence that "Tague cannot carry a weapon *or physically engage with persons*, which is an essential function of the DS position." (Defs.' Mem. in Supp. of Mot. for Summ. J. [95] at 10 (emphasis added).) Defendants raised concerns about Tague's inability to physically engage with others no fewer than six times across their opening and reply briefs. (*Id.* at 10, 19, 22; Defs.' Reply [116] at 1, 3, 8.) Yet Plaintiffs' responsive brief did not even acknowledge Defendants' evidence on this point. (Pls.' Summ. J. Resp. [110].) Tague's motion for reconsideration similarly makes no mention of a DS's obligation to physically restrain others when needed, either to argue that it is not an essential function, or that it is a function Tague can perform.

Furthermore, the fact that DSs at CCB do not carry firearms in courtrooms may well make it all the more critical that these officers be capable of physically restraining a person in an emergency situation. Tague herself emphasizes that DSs do not carry firearms in courtrooms for safety reasons. For example, Plaintiffs state, "Indeed, on one occasion a detainee tried to grab a holstered weapon from a deputy outside of the building, which is why it is unsafe to carry

weapons in the building, particularly in courtrooms." (PSOFR ¶ 120.) And in her supplemental declaration, Tague reiterates that "it is a safety risk to carry guns because of the risk of a detainee or other person strongarming the deputy and trying to grab the gun." (Tague Supp. Decl. ¶ 21.) Thus, according to Tague's own evidence, she has not carried a gun in courtrooms because of the risk of someone "strongarming" her for it, a rationale which itself speaks to the importance of DSs being able to engage physically with violent persons.

In all, although the parties disputed whether carrying a firearm is an essential function of the DS position, it is undisputed that maintaining the ability to physically restrain a person is such a function. And, as Defendants pointed out in their summary judgment reply brief, "Tague has no evidence that she can carry a weapon or physically engage with persons as needed." (Defs.' Reply at 8.) The court declines to grant Tague's motion for reconsideration without evidence that Tague can carry out this aspect of the job. The court therefore enters and continues Tague's motion for reconsideration and grants Tague fourteen days to submit evidence that her inability to lift a firearm to shoulder level does not also impair her ability to restrain a person as necessary to maintain security.

## C. Remaining Elements of Tague's ADA Claims

Although Tague's motion for reconsideration primarily concerns the essential-functions analysis, Defendants contend that she has failed to create a genuine dispute of material fact relevant to other dispositive elements of her claims, as well. In its summary judgment order, the court found the essential functions element dispositive and did not address in detail Tague's arguments concerning the remaining elements of her ADA claims. *See Leibas*, 2022 WL 971519, at *14 n.11. For the sake of completeness, the court undertakes that discussion here and explains why there are, at a minimum, disputes of material fact on these other arguments, precluding summary judgment.

## 1. Tague's Disability Status

16

First, Tague bears the burden of showing that she has a physical or mental impairment that imposes a substantial limit on a major life activity. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 994, 950–51 (7th Cir. 2000). Tague argues that she is disabled because her arthritis substantially limits the major life activities of working and lifting. (Tague's Mot. for Recons. at 12–13; Pls.' Summ. J. Resp. at 14–15.) Tague has not argued that her inability to lift a firearm limits her ability to work in general, so she cannot prevail on that point. 29 C.F.R. § 1630, Appendix, Interpretative Guidance on Title I of the Americans With Disabilities Act ("Appendix"), *Substantially Limited in Working* ("Demonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working"); *Carothers v. County of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015). Tague has, however, presented evidence that arthritis impairs her ability to lift in general, which numerous courts in this district have found to be a substantial limitation on a major life activity. *See Gray v. FleetPride, Inc.*, No. 21 CV 4981, 2022 WL 10080811, at *4 (N.D. Ill. Oct. 17, 2022) (collecting examples). Tague therefore qualifies as disabled under the ADA.

## 2. Failure to Accommodate: Breakdown in the Interactive Process

The only remaining element of Tague's failure-to-accommodate claim is a showing that CCSO failed to reasonably accommodate her disability.[6] *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). An employer and employee engage in an interactive process to find a reasonable accommodation. *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998). The employer faces liability for failing to accommodate only if it bears responsibility for a breakdown in that interactive process. *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996).

---

[6] The second element of Tague's failure-to-accommodate claim—requiring her employer to be aware of her disability—is undoubtedly met because Tague's inability to lift is what led to her failing to qualify with her firearm during the annual DS training.

As Tague sees things, whether Reierson was responsible for a breakdown in the interactive process is a question for the jury. (Tague Mot. for Recons. at 15.) Tague argues that Reierson bears responsibility for the breakdown because only two hours after Tague submitted her ADA paperwork to HR, Reierson emailed her a link to the eSkills Assessment, explaining that the "test will be used to assist in determining whether there are other positions at CCSO for which [Tague is] qualified." (Pls.' Summ. J. Resp. at 19; PSOFR ¶ 125; Ex. 10 to Tague Dep. [109-11].) Thus, Tague asserts, Reierson did not engage in the interactive process in good faith, but rather only presented options that would result in a pay cut (going on disability) or demotion (taking the eSkills Assessment).

Defendants, on the other hand, argue that Tague voluntarily went on disability leave "before the conclusion of the interactive process," so Reierson cannot be at fault. (Defs.' Reply at 15.) The court concludes that the point in time that the interactive process concluded or broke down is a uncertain--a question of fact that, on this record, is best left to a jury. Defendants would not be entitled to summary judgment on this score.

### 3.     Disparate Treatment: Adverse Employment Action

In addition to requiring Tague prove she is disabled under the meaning of the ADA, Tague's disparate-treatment claim requires her to show that she suffered an adverse employment action because of her disability. *See Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008). An adverse employment action may take many forms, such as "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) (quotation marks omitted).

Tague argues that she suffered an adverse employment action because the only options available to her were (1) take the eSkills Assessment test to be transferred to a non-sworn position, (2) clear her restrictions, or (3) not return to work (e.g., remain on disability). (Tague's

Mot. for Recons. at 14; Pls.' Summ. J. Resp. at 16–17.)  While beliefs or opinions alone are not evidence, there is substantial evidence that Tague's inability to carry a weapon would result in removal from her DS position.  *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014).  For example, when Tague took the eSkills Assessment, she answered questions about typing speed, spreadsheets, word documents, and customer service, questions that she testified had "not anything to do with the deputy sheriff qualifications."  (Tague Dep. at 88:19–24.) Reierson testimony confirms this; she explained that CCSO gave officers the eSkills Assessment as a first step for moving them into a non-sworn position:

> Q:  Well, since you wrote this, what did you mean when you said, this test will be used to assist in determining whether there are other positions at CCSO for which you are qualified?
>
> A:  I mean that's exactly what it meant.  The skills test was kind of like a—is a basic office skills assessment, like we talked about before.  And if you're—if employees are able to score at a certain level, then that would qualify them for other positions in the sheriff's office.
>
> Q:  Meaning, non-deputy sheriff positions at Sheriff's office; is that true?
>
> A:  Yes.

(Reierson Dep., Ex. 5 to DSOF [96-5] at 121:19–122:8.)  On this record, a jury could find that Tague suffered an adverse employment action when her only options were to clear her restrictions, remain on disability, or take the eSkills Assessment to be placed in a de-deputized role.  *See, e.g.*, *Winkfield v. Chicago Transit Authority*, 453 F.Supp. 904, 912 (N.D. Ill. 2020) (denying summary judgment on adverse employment action when plaintiff was removed from her position until medically cleared to return).

Defendants are not entitled to summary judgment based on these remaining elements of Tague's ADA claims.

## II.    Defendants' Motion for Reconsideration

Defendants move the court to reconsider the denial of summary judgment for Plaintiff Leibas's ADA discrimination and failure-to-accommodate claims.  Defendants reiterate that taking

three additional unplanned breaks per shift would interfere with the undisputed essential job function of adequately supervising inmates. (Defs.' Mot. for Recons. [129] at 4; Defs.' Reply at 1.) Defendants argued at summary judgment that binding precedent instructs that restrictions such as Leibas's render a correctional employee unqualified to perform her essential job functions. For example, in *Miller v. Illinois Dept. of Correction*, 107 F.3d 483, 485 (7th Cir. 1997), the Seventh Circuit recognized that "[t]he prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have experience in the positions, such as searching and escorting inmates, that provide the necessary training and experience for responding effectively to a riot, as well as the capability of such response." In its review of the record, the court finds this last phrase particularly significant: Leibas must be capable of effectively responding to unpredictable, stressful, and physically demanding events. While additional short bathroom breaks would like not generate concern, the ADA accommodation paperwork Leibas's doctor submitted states she needs breaks of "indefinite" duration. (Ex. 82 to Leibas Dep. [96-10] at Defendants 4419). The paperwork also notes that Leibas requires "more frequent breaks and rest periods and bathroom breaks, up to three additional times per shift," suggesting she may need to be away from her workstation for a significant portion of the workday. (*Id.*) If Leibas's station is unexpectedly unattended due to an unplanned break, she would necessarily be incapable of responding as needed during that time. The court did not apprehend this argument in its summary judgment order and finds it persuasive.

Defendants also cite, as they did at summary judgment, *Tate v. Dart*, No. 17-cv-08888, 2021 WL 3737728 (N.D. Ill. Aug. 24, 2021). The Seventh Circuit recently affirmed the district court's ruling in *Tate*, issuing an opinion that informs the analysis of Defendants' motion. *See Tate*, 51 F.4th at 795–801. Tate worked as a sergeant (and sought a promotion to lieutenant) in CCDOC, the facility where Leibas worked as a CO. *Id.* at 791. Due to medical restrictions, Tate sought an accommodation that would allow him "to avoid situations in which there is a significant chance of violence or conflict." *Id.* The Seventh Circuit held that Tate was not a qualified

individual because this restriction interfered with an essential job duty of the lieutenant role: the ability to respond physically to violent emergencies. *Id.* at 802. As in *Tate*, a concern for public safety prevails here. *See id* at 796–98. Even though extra breaks may be a reasonable accommodation in some professions—as it was for the court reporter in the case the court compared to Leibas's at summary judgment—it is not reasonable for the CO position. *See Leibas*, 2022 WL 971519, at *15 (citing *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, and 22nd Jud. Cirs.*, 601 F.3d 674, 680 (7th Cir. 2002)). The reason for this is clear: if Leibas must leave her workstation, and there is no one there to take her place, no one would be present to respond to an emergency in that area. *See Tate*, 51 F.4th at 797 ("In the Cook County Department of Corrections, while the correctional staff surely work as a team in the larger sense, they cannot share the responsibility of responding to violent emergencies and sudden physical altercations by stepping aside and calling others.")

Additionally, undisputed evidence shows that the correctional facility is so strained for adequate staffing that officers at times do not receive the breaks negotiated for in their contract, let alone the ability to relieve their colleagues for additional rest periods. Leibas's deposition testimony recognized this: she acknowledged that taking additional breaks poses a problem because "there are times that there's not enough coverage of officers." (Leibas Dep. [96-10] at 110:2–12.) Leibas also testified that Reierson told her during the interactive process that extra breaks "could not be guaranteed" due to staffing shortages, and Leibas noted that "sometimes there's not enough people to send out to cover your lunch." (*Id.* at 118:16–119:2.) Especially given CCSO's short supply of labor, it is not a reasonable accommodation for CCSO to send another officer to relieve Leibas of her duties during unplanned breaks.[7] *See Majors v. General*

_____

[7] Defendants also argue that allowing Leibas to take more frequent breaks would exceed a bargained-for provision in the CBA that governs the CO position. Defendants did not make this argument at summary judgment and so have waived the point. *Caisse Nationale de Credit Agricole*, 90 F.3d at 1270.

*Elec. Co*, 714 F.3d 527, 534 (7th Cir. 2013) ("To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation.").

In sum, it is undisputed that Leibas's restrictions require her to take additional breaks, up to three per shift. Undisputed evidence shows that such breaks necessarily interfere with essential functions of the CO role. Because Leibas did not present evidence showing that she can perform the essential functions of her position with or without a reasonable accommodation, she is not a qualified individual under the ADA. Because showing that she is a qualified individual is a requirement of her ADA claims, Leibas has not met her burden, and her claims fail as a matter of law.[8] Accordingly, the court grants Defendants' motion for reconsideration and concludes that Defendants are entitled to summary judgment on Leibas's claims.

## CONCLUSION

For the reasons set forth above, Tague's motion for reconsideration [127] is entered and continued. The court grants Tague fourteen days to submit evidence from which a reasonable jury could find that her physical limitations do not impair her ability to physically restrain a person. If she cannot make that showing, the court will deny her motion for reconsideration. Defendants' motion for reconsideration [129] is granted, and the court amends its prior order [124], granting summary judgment to Defendants on Leibas's claims.

ENTER:

Dated: December 19, 2022

REBECCA R. PALLMEYER
United States District Judge

---

[8] In addition to arguing that that undisputed evidence demonstrates Leibas in not a qualified individual, Defendants argue they are entitled to summary judgment because Leibas did not face an adverse employment action and thwarted the interactive process by failing to respond or communicate with Reierson. Because the qualified-individual element is dispositive, the court need not address those arguments here.